Case No. A30-0290 ivil (JWS)                    Jeong Ho Lee

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


UNITED STATES OF AMERICA for    )
the use of POONG LIM/PERT       )
JOINT VENTURE,                  )
                                )
            Plaintiff,          )
                                )
vs                              )
                                )
DICK PACIFIC/GHEMM JOINT        )
VENTURE, CONTINENTAL CASUALTY   )
COMPANY, NATIONAL FIRE          )
INSURANCE COMPANY OF            )
HARTFORD, SEABOARD SURETY       )
COMPANY, and ST. PAUL FIRE      )
AND MARINE INSURANCE COMPANY,   )
                                )
            Defendants.         )
                                )
Case No. A03-0290 Civil (JWS)


        DEPOSITION OF DICK PACIFIC/GHEMM JOINT VENTURE

                    JEONG HO LEE
                     (Personal)
               Taken March 23, 2005
              Commencing at 10:55 a.m.


             Taken by the Defendants
                        at
              Renaissance Seoul Hotel
                  Seoul, Korea
     676 Yeoksam-dong, Gangnam-gu, Seoul, Korea, 135-915


EXHIBIT __1__
Page __1__ of __5__ Pages

Case No. A30-0290 ivil (JWS)                    Jeong Ho Lee

Page 4

1    SEOUL, KOREA        WEDNESDAY, MARCH 23, 2005, 10:55 A.M.

2

3                    JEONG-WON HONG,

4            was sworn on oath to interpret English

5            into Korean, and Korean into English

6            to the best of her ability.

7

8                    JEONG HO LEE,

9            deponent herein, being sworn on oath,

10           was examined and testified as follows:

11

12                    EXAMINATION

13    BY MR. POLLOCK:

14           Mr. Lee, the deposition we have taken this

15    morning and on Monday was a deposition under Federal

16    Rule of Civil Procedure 30 (b(6).  You were designated

17    as the corporate representative with regard to the

18    plaintiff, Poong Lim's claims against the defendants.

19       A    Yes.

20       Q    That deposition concluded awhile ago, and we

21    will now take your deposition in your individual

22    capacity.

23           So the same basic rules apply in that you are

24    under oath and providing sworn testimony.

25       A    Yes.        EXHIBIT_____1____

                          Page____2___of___5___Pages

c514cd8e-7041-41c6-9545-32c6851f5121

Case No. A30-0290 ivil (JWS)                    Jeong Ho Lee

Page 63

1    Poong Lim/Se Jin contract or was this just the

2    contract value?

3        A    350,000 United States dollar amount includes

4    the approved change orders for Poong Lim and Se Jin,

5    including exterior work support, stair and erection

6    aids.  He does not know whether other change orders

7    were made afterwards.

8            MR. MACHETANZ:  Can I get a clarification

9    here.  At one time I thought it was 325,000 and then I

10   heard 350,000.

11           MR. POLLOCK:  Yes.

12           THE INTERPRETER:  325,000.

13           MR. POLLOCK:  325 total and contract amount.

14           THE WITNESS:  Yes.

15           MR. MACHETANZ:  Thank you.

16   BY MR. POLLOCK:

17       Q    Did Poong Lim withhold any money from Se Jin

18   on the Bassett Project?

19       A    He is not sure whether we have withheld or

20   not from Se Jin.

21       Q    Did Poong Lim issue any deductive change

22   orders to Se Jin on the Bassett Project?

23       A    We didn't issue any deductive change orders.

24   We issued only the increasing change orders.  And he

25   understands that we have more change orders which will

EXHIBIT    1
Page___3___of___5___Pages          c514cd8e-7041-41c6-9545-32c6851f5121

Case No. A30-0290 ivil (JWS)                    Jeong Ho Lee

Page 64

1    be increasing change orders to be issued to Se Jin.

2        Q     Who at Poong Lim, other than yourself, would

3    have knowledge concerning payments made by Poong Lim

4    to Se Jin on the Bassett Project?

5        A     The person who is in charge of contracts,

6    H.Y. Lee.

7        Q     What pending change orders are there existing

8    between Poong Lim and Se Jin concerning the Bassett

9    Project?

10       A     Among the change orders that we submitted,

11   change order 8 and change order 9.

12             And also we have a change order which is part

13   of the change order containing the detailing manhours.

14   It is also related to Se Jin.

15             On the Exhibit 345 we have detailing

16   manhours.

17       Q     So change orders 8 and 9 which are identified

18   on Exhibit 345.

19             So is the resolution of that change order 8

20   and 9 as between Poong Lim and Se Jin contingent on

21   Poong Lim recovering in this lawsuit?

22       A     Yes, it's related.

23       Q     What agreements or understandings have Se Jin

24   and Poong Lim reached concerning the outcome of this

25   litigation?

EXHIBIT    1
Page   4   of   5   Pages

c514cd8e-7041-41c6-9545-32c6851f5121

Case No.A30-0290 ivil (JWS)                    Jeong Ho Lee

Page 65

1     A    Se Jin and Poong Lim did not document any

2   specific agreement on this matter.  But both Se Jin

3   and Poong Lim share the understanding that all these

4   issues are due to the external impact.  And both the

5   parties have the understanding that we should have

6   desirable consequences from the litigation.

7          So after the judgments are made, the two

8   parties will address the issue on a goodwill basis.

9     Q    As to the amounts identified in change orders

10  8, 9 and 12 that would be attributable to Se Jin's

11  detailing, those amounts, am I correct, have not

12  currently been paid to Se Jin?

13    A    Yes, that's correct.

14         MR. POLLOCK:  Why don't we take another

15  ten-minute break here.

16              (Recess taken.)

17         Back on the record.

18    Q    Mr. Lee, the subcontract issue in the Bassett

19  Project is with Poong Lim/PERT; is that correct, a

20  joint venture between Poong Lim/PERT?

21    A    Yes.

22    Q    What was PERT's role in the joint venture?

23    A    Poong Lim's role spans to the CIF to the port

24  of the United States, and PERT steps in from that

25  point, and PERT takes care of the duty related issues

EXHIBIT    1

Page___5___of___5___Pages    c514cd8e-7041-41c6-9545-32c6851f5121

서울시 강남구 역삼동 823번지
풍림빌딩 12층

**公證認可 法務法人 亞 洲**

LAW OFFICES OF AJU INTERNATIONAL

공 증 실 : 02.3016.5240
팩　　스 : 02.3016.5241

[제41호 서식]

등부　2006년　제 00401 호

Registered No.　2006 - 00401


# 인　　　증　　　서

# NOTARIAL CERTIFICATE



EXHIBIT___2___

Page___1___ of ___10___ Pages

## PASS THROUGH AGREEMENT

WHEREAS Sejin  supplied shop drawing services to Poong Lim/Pert Joint Venture (hereinafter "PL") on the Bassett Hospital replacement project (hereinafter "project");

WHEREAS Sejin and PL have project claims which are based on actions and inactions by the project general contractor Dick Pacific/Ghemm Joint Venture ("DPG"); and

WHEREAS Sejin and PL previously agreed orally that PL would pass-through Sejin's project claims against DPG; and

WHEREAS Sejin and PL now wish to enter into a pass-through agreement to memorialize in writing the  terms under which those claims will be prosecuted, the parties recognizing that under United States federal law, it would be better to definitize the terms and place them in writing;

NOW, THEREFORE, Sejin and PL agree as follows:

1.     Except as stated below, Sejin hereby releases any and all claims, either known or unknown, relating to the project that it may have against PL and its agents, employees, successors, assigns, sureties and/or insurers relating to the project.  Except as stated below, PL hereby releases any and all claims, known or unknown, relating to the project that it may have against Sejin and its agents, employees, successors, assigns and/or insurers relating to the project.

2.     Both parties desire to jointly pursue claims against DPG and its payment bond sureties (collectively "DPG") on the above project relating to damages incurred by each party as a result of the DPG's acts and omissions, so PL, on its own behalf and on behalf of Sejin, has filed suit against DPG.  The parties agree to fully cooperate with each other in pursuit of such claims against DPG.

3.     The parties mutually agree that, except as may be recovered from DPG, they will pursue no project claims against each other except as provided below.  PL remains liable to

C:\Documents and Settings\삼성\Local Settings\Temporary Internet Files\Content.IE5\2TPARUHS\A-TM-PASS THROUGH AGMT 995440002[1].doc

EXHIBIT 2

Page 2 of 9 Pages

Sejin only to the extent that DPG is liable on claims prosecuted under this agreement. The parties have specifically contemplated the Severin doctrine in making this agreement. This is not a release for purposes of the Severin doctrine, if that doctrine is deemed applicable in any way under Alaska law. The parties agree to look for payment solely to the fund created by DPG. Regardless of whether the fund be created by the settlement, trial or on appeal from any trial, it is the sole source of any funds to be recovered on the claims hereunder.

4.    In allocating funds obtained from the DPG between the parties, the parties will first try to obtain a specific segregation of funds in any settlement or trial in this matter. In the event that they are unable to obtain a specific segregation, then the funds will be divided on an equitable basis with PL having the final decision on division, taking into account any amounts paid to DPG or International Steel, and the costs and attorneys feels incurred by PL in prosecuting the claims.

5.    PL shall initially bear the attorneys' fees and costs associated with the joint pursuit of this claim, but the fees and costs shall be reallocated between the parties following the trial, based on each party's respective recovery. If any fees and costs are awarded against PL in any trial of this matter, the fees and costs shall be borne by PL.

6.    The decision of whether or not to settle project claims shall be at the sole and absolute discretion of PL.

7.    This pass through agreement does not extinguish, modify, limit or otherwise affect (a) warranty claims under the prime contract and/or subcontract; and (b) claims for indemnification, apportionment, contribution and the like arising from or related to claims of third parties.

8.    The parties hereto acknowledge that they have no claims against the other relating to the project which are not dealt with in this agreement.

C:\Documents and Settings\삼성\Local Settings\Temporary Internet Files\Content.IE5\2TPARUHS\A-TM-PASS THROUGH AGMT 995440002[1].doc

EXHIBIT 3
Page 2 of 10 Pages

2

9.    This agreement shall constitute the sole and complete agreement of the parties and shall not be changed, modified or abridged except by written agreement subscribed by the parties hereto.

Dated: 3 APRIL 2006

Sejin

by _____

its _____PRESIDENT_____

Dated: 3 APRIL 2006

Poong Lim/Pert Joint Venture

by _____

its _EXECUTIVE   DIRECTOR_

EXHIBIT 2
Page 4 of 10 Pages

서울 강남구 역삼동 823번지    公證    法務法人    亞 洲    대표전화 : 3016-5200
(풍림빌딩 12층)    認可                          공 증 실 : 3016-5240
LAW OFFICE OF AJU INTERNATIONAL    F A X : 3016-5241

[제42호 서식]

등부 2006년    제 00401호    Registered No. 2006 - 00401

인    증    NOTARIAL CERTIFICATE

위 계약서 ------------------------

에 기재된 주식회사 세진설계 대표이사
김영신, 김경환 등은---------------

본직의 면전에서 위 사서증서에 자기가
서명한 것임을 자인하였다.

2006년 04월 03일

이 법인사무소에서
위 인증한다.

Young Shin Kim, President of Sejin and
Kyung Hwan Kim, personally appeared
before me and admitted their subscription
to    the    attached    PASS    THROUGH
AGREEMENT.

This is hereby attested on this 03rd day
of April, 2006 at this office.

공증인가 법무법인 아 주

서울시 강남구 역삼동 823번지

LAW OFFICE OF AJU INTERNATIONAL
12Fl., Poonglim Bldg, 823 Yeoksam-dong
Gangnam-gu, Seoul, Korea

*유 승 수* (signature) *Yoosoungsoo*

담당변호사    Attorney-at-law acting as Notary Public

유  승  수    SEUNG-SOO YOO

본 법인은 법률 제3790호에 의거하여
1994년 11월 7일 법무부 장관으로부터
공증인 업무를 행할 것을 인가받았다.

This Office has been authorized by the
Minister of Justice, the Republic of Korea,
to act as Notary Public since Nov. 7. 1994
under Act No. 3790.

EXHIBIT 2

Page 5 of 10 Pages

# CERTIFICATE

The undersigned hereby certify that The English Version of PASS THROUGH AGREEMENT executed between Sejin and Poong Lim has been translated into the Korea Version, as attached hereto, at the best of my knowledge.

I also confirm that both English and Korean Version of the said Agreement has been read to Mr. Kim of Sejin for his full understanding of the whole content of the said Agreement.

Date: <u>3 April 2006</u>

<u>Lee Hee Young</u>
Name of Translator



EXHIBIT ____Z____
Page___6___ of ___10___ Pages

# PASS THROUGH AGREEMENT

Sejin 은 Bassett Hospital replacement 프로젝트 건에 대하여 Poong Lim/Pert

JV(이하 "PL") 로 도면 제작 서비스를 제공하였으며,

Sejin 과 PL 은 원청사인 Dick Pacific/Ghemm Joint Venture (이하 "DPG")의

행위와 비행위에 대해 소송을 제기하며,

Sejin 과 PL 은 PL 이 DPG 에 대한 Sejin 의 소송건을 통과시킬 것을

구두상으로 이전 합의하였으며,

Sejin 과 PL 은 이제 소송 제기를 위한 서면 작성에 있어서 PASS

THROUGH AGREEMENT 을 맺기를 바라며 본 협약내의 조항에 따라 소송이

진행된다. 당사자들은 미 연방법 하에 PASS THROUGH AGREEMENT 을 인정한다.

PASS THROUGH AGREEMENT 내의 조항은 정확히 명시하여 서면작성을 하여야

하기에, Sejin 과 PL 은 다음에 합의한다. :

1.      아래와 같이 언급된 경우를 제외하고, Sejin 은 프로젝트와 관련하여

PL 과 PL 의 중개인, 직원, 승계자, 수탁인, 인수인이나 프로젝트완 관련된

보험자에 대한 어떠한 소송도 제기 하지 않는다. 아래와 같이 언급된 경우를

제외하고, PL 은 프로젝트와 관련하여 Sejin 과 Sejin 의 중개인, 직원, 승계자,

EXHIBIT 2
Page 7 of 10 Pages

수탁인, 인수인이나 프로젝트완 관련된 보험자에 대한 어떠한 소송도 제기 하지 않는다

2.    양 당사자는 DPG 와 지급 보증 담보 에 대해 공동으로 소송 제기 할 것을 희망한다. 이 소송은 본 프로젝트에서 DPG 의 행위와 직무태만으로 인하여 각 당사자가 빚은 손해와 관련한다. 그리하여 PL 은 PL 과 Sejin 을 대표하여, DPG 에 소송을 제기 했다. 당사자들은 DPG 소송을 위해 전적으로 협력할 것에 동의 한다.

3.    당사자들은 DPG 에 의해 손해 배상을 받은 경우를 제외 하고 다음과 같은 사항에 대해 상호간에 동의한다. 아래 언급된 경우를 제외하고는 어떠한 프로젝트와 관련해서도 서로에게 소송을 제기 하지 않는다. PL 은 본 협의 하에 진행된 소송에 대해서 DPG 가 갚아야 할 부채에 대해서만 비용을 지불 할 의무가 있다. 당사자들은 본 협약서 작성에 있어서 특히 Severin Doctrine 을 참고한다. Severin Doctrine 이 Alaska 법에 적용 되더라도 이것은 Severin Doctrine 의 알리기 위함이 아니다. 당사자는 DPG 에 의해 발생된 자금에 관한 비용만을 기대한다. 본 소송과 관련한 어떠한 소송에 의해서 발생된 합의금인지 여부와는 상관없이, 그것은 본 소송에 의거한 배상금이다.

4.    DPG 와 당사자사간에 발생된 QLDYD 할당 시, 당사자들은 본 사건과 관련하여 비용 분배를 할 것이다. 비용 분배가 불가능 할 경우에, DPG 와

EXHIBIT 2
Page 8 of 10 Pages

International Steel 에 지급 해야 할 비용과 PL 이 본 소송을 진행하면서 발생된

비용과(변호사 비용 포함)을 고려할 때 자금은 형평법에 근거 하여 PL 이 최종

결정을 한다

5.    PL 은 본 소송 제기를 공동으로 진행하면서 발생된 변호사 비용과

그 외 비용을 감수 해야 한다. 그러나 본 소송에 따라 당사자들 사이에서 이

비용은 다시 분배가 이루어 져야 하며, 비용 분배시 당사자들간의 보상비용에

의거한다. 만약 본 사건에 대에 PL 이 고소를 당한 경우 이에 따라 소요된 어떠한

비용도 PL 은 비용은 다시 발생시킬 수 있다. .

6.    본 소송에 대한 합의 여부는 오직 PL 의 결정에 따른다.

7.    본 PASS THROUGH AGREEMENT 는 소멸, 제한 되지 않는다.

그렇지 않으면, 이것은(a) 주계약 또는 하도급 계약에 본 소송, (b) 배상, 분담,

기부와 제 삼자에 의한 소송으로 인해 발생된 것과 관련된 소송에 영향을 미친다. .

8.    당사자들은 다른 프로젝트와 관련하여 본 협약과 관련이 없는

소송은 제기 하지 않는다는 것을 숙지 하고 있다.

9. 본 협약서는 당사자들의 동의에 의해 완성된 단 하나의 동의서이며 이

내용은 수정, 변경 또는 압축 되지 않는다. 단지, 당사자들에 의한 서명이 된

경우에는 제외된다.

EXHIBIT 2
Page ___ of ___ Pages

Dated: _____    Sejin


by_____

its _____


Dated: _____        Poong Lim/Pert Joint Venture


by_____

its _____

EXHIBIT 2
Page 15 of ___ Pages

Case No.A03-0290 Civil (JWS)                    Kim Young Shin

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


UNITED STATES OF AMERICA for        )
the use of POONG LIM/PERT           )
JOINT VENTURE,                      )
                                    )
            Plaintiff,              )
                                    )
vs                                  )
                                    )
DICK PACIFIC/GHEMM JOINT            )
VENTURE, CONTINENTAL CASUALTY       )
COMPANY, NATIONAL FIRE              )
INSURANCE COMPANY OF                )
HARTFORD, SEABOARD SURETY           )
COMPANY, and ST. PAUL FIRE          )
AND MARINE INSURANCE COMPANY,       )
                                    )
            Defendants.             )
                                    )
Case No. A03-0290 Civil (JWS)


        DEPOSITION OF DICK PACIFIC/GHEMM JOINT VENTURE

                    KIM YOUNG SHIN

                Taken March 24, 2005
                Commencing at 2:00 p.m.


            Taken by the Defendants
                      at
            Renaissance Seoul Hotel
                Seoul, Korea
    676 Yeoksam-dong, Gangnam-gu, Seoul, Korea,135-915


EXHIBIT  3
Page  1  of  4  Pages

Case No. A03-0290 Civil (JWS)                    Kim Young Shin

---

**Page 2**

```
 1           A-P-P-E-A-R-A-N-C-E-S
 2
   For Plaintiff:
 3   OLES, MORRISON, RINKER & BAKER, LLP
     By: Traeger Machetanz
 4   745 W. Fourth Avenue, Suite 502
     Anchorage, Alaska 99501
 5   907-258-0106
 6
   For Defendants:
 7   DAVISON & DAVISON, INC.
     By: Joseph Pollock
 8   3351 Arctic Boulevard
     Anchorage, Alaska 99503
 9   907-363-6555
10      and
11   ERIK D. EIKE
     707 Richards Street
12   Suite 2012
     Honolulu, Hawaii 96813
13   808-537-5950
14   Interpreters:
15   JEONG-WON HONG
     YEONJOO KANG
16
17   Also Present:
18   SIN DOO KANG
19   Court Reporter:
20   Barbara Blowers
21   BE IT KNOWN that the aforementioned deposition was taken at
22   the time and place duly noted on the title page, before
23   Barbara Blowers, Registered Professional Reporter and
24   Notary Public within and the state of Alaska.
25
```

**Page 3**

```
 1              I-N-D-E-X
 2
 3                      PAGE
 4   EXAMINATION
 5      BY MR. POLLOCK           4
 6
 7
   EXHIBITS
 8
     353 - Multiple e-mails        38
 9
10
11
12
13
14
15
16
17
18
19
20   EXHIBIT    3
21
22   Page   2   of   4   Pages
23
24
25
```

**Page 4**

```
 1   SEOUL, KOREA.      MARCH 24, 2005, 2:00 P.M.
 2
 3        JEONG-WON HONG,
 4   the Korean interpreter was sworn on oath
 5   to interpret English into Korean and
 6   Korean into English.
 7
 8        KIM YOUNG SHIN,
 9    deponent herein, being sworn on oath,
10   was examined and testified as follows:
11
12            EXAMINATION
13
14   BY MR. POLLOCK:
15      Q   Mr. Kim, we've met previously.  My name is
16   Joe Pollock, and I represent the defendants, Dick
17   Pacific/Ghemm and four insurance companies in a
18   lawsuit initiated by Poong Lim/PERT Joint Venture.
19   The lawsuit is pending in the United States District
20   Court for the District of Alaska, located in
21   Anchorage, Alaska.
22        The lawsuit arises out of a construction
23   project known as the Bassett Hospital Replacement
24   Project, located at Fort Wainwright, Alaska.
25        We have asked you to come here today to
```

**Page 5**

```
 1   provide sworn, under-oath testimony concerning this
 2   litigation.
 3        The testimony that you will provide in this
 4   deposition today, may be used in the litigation
 5   pending in Anchorage, Alaska.
 6        I will be asking you a series of questions,
 7   and if for some reason you do not understand any
 8   question, please let me know, and I will try to
 9   rephrase it in a manner so that you can understand it.
10   It is particularly important, given that we are
11   translating the questions into Korean.
12        During the course of the deposition,
13   Mr. Machetanz may have occasion to make objections,
14   and he will do that for the record.  But unless he
15   instructs you otherwise, you can go ahead and answer
16   the question if he objects.
17        And we've been taking breaks about once an
18   hour or so, but in the event that you need to take a
19   break before then, just let us know, and we will take
20   a break.
21        Would you state your name for the record?
22      A   His name is Kim Young Shin.  Family name Kim,
23   K-i-m, and first name is Young Y-o-u-n-g, Shin,
24   S-h-i-n.
25      Q   Mr. Kim, have you had your deposition taken
```

70c74052-6bbf-4839-bfb8-4e173709cbf9

Page 6

1  before?
2     A   No.
3     Q   Are you represented by an attorney today?
4     A   Yes.
5     Q   Mr. Machetanz?
6     A   Yes.
7     Q   Outside of discussions with Mr. Machetanz or
8  Mr. Butler, have you had any discussions with anyone
9  about this deposition before you came here today?
10    A   No.
11    Q   Mr. Kim, do you speak English?
12    A   No, almost not.
13    Q   I don't speak any Korean.
14        Mr. Kim, do you read English?
15    A   No.
16    Q   Mr. Kim, were you involved in matters
17 concerning the Bassett Hospital Project?
18    A   He did.
19    Q   Who is your current employer?
20    A   He's currently working for Se Jin
21 Engineering.
22    Q   What is your position with Se Jin?
23    A   He is a representative.
24    Q   Are you a corporate officer of Se Jin?
25    A   Yes.

Page 7

1     Q   What is your corporate position?
2     A   Representative president of the company.
3     Q   Are you a shareholder or owner of Se Jin?
4     A   He's the owner of Se Jin Engineering.
5     Q   Do you own the entire company?
6     A   Practically owns the entire company, but in
7  order to meet the registration requirement we have
8  some registered executives.
9     Q   What percentage of the company do you own?
10    A   Sixty percent under his name.
11    Q   Who are the other owners of Se Jin besides
12 yourself?
13    A   His wife and son.
14    Q   Anyone else?
15    A   And two relatives.
16    Q   Does Poong Lim in any way have any ownership
17 interest in Se Jin?
18    A   You mean ownership in trust?
19    Q   Yes.
20    A   Poong Lim does not have any executive
21 interests in Se Jin.
22    Q   Are any of the Poong Lim officers, employees
23 or shareholders owners of Se Jin?
24    A   No.
25    Q   So Se Jin and Poong Lim are separate

Page 8

1  companies?
2     A   Separate and independent.
3     Q   Okay.
4         Mr. Kim, what was your involvement with the
5  Bassett Project?
6     A   He took the leading role in regards to the
7  Bassett Project and if a drawing is prepared, he
8  reviewed the drawing.
9     Q   Did Se Jin have a contract with Poong Lim for
10 the Bassett Project?
11    A   Yes.
12    Q   Was that contract in writing?
13    A   Yes.
14    Q   When was that contract first entered into?
15    A   He does not remember the specific date, but
16 actual activities upon the orders of Poong Lim started
17 in the middle of February, 2002.
18    Q   What was the scope or what were the
19 obligations that Se Jin assumed as a result of the
20 contract existing between Poong Lim and Se Jin?
21    A   The first order stipulated that Se Jin would
22 provide the shop drawings of structural steel with
23 regard to the Bassett Project.
24    Q   How much was the value of this contract?
25    A   After the original contract was signed, he

Page 9

1  made two changes to the contract.  But what he
2  remembers in terms of the contract of the original
3  contract was 280 million Korean won.
4         Which is approximately $280,000.
5     Q   In this original contract, did Se Jin
6  obligate itself to provide all the shop drawings for
7  structural steel that Poong Lim had obligated itself
8  to provide to Dick Pacific?
9     A   He's not quite sure what the shop drawing of
10 the structural steel means, but what he says is the
11 original contract included the shop drawings of the
12 structural steel that Poong Lim is to provide to Dick
13 Pacific.
14    Q   You mentioned two changes to the contract.
15        What do you recall the two changes to the
16 contract being?
17    A   The first change was to add the stair related
18 part to the contract.
19        And second contract change was to add the
20 exterior wall support.
21    Q   Does he recall the value of the change orders
22 for those two respective changes?
23    A   He does not remember the specific amount for
24 each change.  But what he remembers is the final
25 contract value which was 326 million Korean won.

Case No.A03-0290 Civil (JWS)                    Kim Young Shin

Page 10

1    Q    And has Poong Lim paid Se Jin the entire
2    amount of its contract, including change orders?
3    A    Yes.
4    Q    Did Poong Lim assert any claims against Se
5    Jin arising out of the Bassett Project?
6    A    No, not directly yet.
7    Q    What about indirectly?
8    A    What he means is that he heard over the phone
9    from Poong Lim that the contract party claim of the
10   drawings, but he didn't receive that type of claim
11   from Poong Lim directly.
12   Q    Can you repeat that answer?
13       THE INTERPRETER:  When he had a phone call
14   with a Poong Lim person, then during the phone
15   conversation he heard that some claims were raised by
16   the other party.  But Poong Lim did not raise this
17   type of claims again Se Jin.
18   BY MR. POLLOCK:
19   Q    So referring to claims raised by Dick Pacific
20   against Poong Lim?
21   A    Yes.  Because Dick Pacific is the only party
22   from which Poong Lim will receive claims.
23   Q    Does Poong Lim promise to pay Se Jin any
24   money as a result of the outcome of the litigation
25   between Poong Lim and Dick Pacific?

Page 11

1    A    Yes.
2    Q    What is your understanding concerning any
3    agreements or arrangements with Poong Lim regarding
4    the outcome of the litigation between Poong Lim and
5    Dick Pacific?
6    A    Can you elaborate more on your question?
7    Q    Has Poong Lim promised to pay Se Jin money in
8    the future if it recovers from Dick Pacific?
9    A    Poong Lim didn't say a specific amount, but
10   what Poong Lim did say is that because Se Jin, some
11   manhours are spent on the project, they will make some
12   payments after the litigation.
13   Q    Has Poong Lim promised to pay any specific
14   amount to Se Jin?
15   A    Not a specific amount.
16   Q    After the Bassett Project, did Se Jin and
17   Poong Lim contract on any other projects?
18   A    After the Bassett Project, Poong Lim Industry
19   stopped fabricating structural steel product.
20       So, no, currently Poong Lim is working on
21   steel bridges only.
22   Q    What type of services does Se Jin Engineering
23   provide?
24   A    He's not quite sure what services means?
25   Businesses you mean?

Page 12

1    Q    Is Se Jin strictly an engineering company or
2    does it provide construction services?
3    A    It's solely an engineering company.
4    Q    Does Se Jin have a particular focus, say
5    mechanical, electrical, structural, geotechnical?
6        What specialty does Se Jin have?
7    A    Se Jin is a structural company, so prepares
8    the shop drawings and also the base drawings for the
9    shop drawings.
10   Q    Does Se Jin provide architectural services?
11   A    When you say architectural services, does
12   that mean preparing architectural drawings?
13   Q    Yes.
14   A    No.
15   Q    Does Se Jin do any civil engineering?
16   A    No.  What they focus on is only the
17   structural steel related area.
18   Q    What were the dollar values of Se Jin's gross
19   sales for 2002 and 2003?
20   A    In 2002, what he remembers is that the sales
21   were ranged from 700 billion to -- 700 million to
22   750 million won and in 2003 the sales were
23   approximately 800 million Korean won.
24   Q    Which would be 800,000?2?
25       THE INTERPRETER:  Approximately.

Page 13

1    BY MR. POLLOCK:
2    Q    How many licensed professional engineers does
3    Se Jin currently have on staff?
4    A    You mean certified PE's?
5    Q    Yes.
6    A    We have two PE's and also the employees of Se
7    Jin has some other types of certifications.
8    Q    Did Se Jin have two PE's on staff in 2002 and
9    2003?
10   A    From what he remembers, we had more PE's than
11   now.
12   Q    During 2002 and 2003, does he have a
13   recollection of the number of employees that Se Jin
14   employed?
15   A    On average, we have 20 employees, around.
16   Q    So for 2002, would the Bassett Project have
17   comprised about 50 percent of your workload?
18   A    More than 50 percent.
19   Q    How about 2003, approximately what percentage
20   of his firm's resources were devoted to the Bassett
21   Project in 2003?
22   A    What he can say is that the members who
23   worked on the Bassett Project in 2002 continued to do
24   their work on Bassett Project until April.  And the
25   number of exact persons may change either plus or by

STEPHEN C. SCHWARTZ, VOL. I

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA for the use
of POONG LIM/PERT JOINT VENTURE,

      Plaintiff,

vs.

DICK PACIFIC/GHEMM JOINT VENTURE,
CONTINTENTAL CASUALTY COMPANY,
NATIONAL FIRE INSURANCE CO. OF
HARTFORD, SEABOARD SURETY CO.,
and ST. PAUL FIRE AND MARINE
INSURANCE COMPANY,

      Defendants.
_____/

Case No. A03-0290 Civil


DEPOSITION OF STEPHEN C. SCHWARTZ

VOLUME I

Pages 1 - 224, inclusive

Thursday, May 25, 2005, 9:00 A.M.



Taken by Counsel for Defendants

at

Law Offices of Oles, Morrison, Rinker & Baker, LLP

745 W. Fourth Avenue, Suite 502

Anchorage, Alaska


EXHIBIT _____4_____
Page___1___of___11___Pages

78201003-8b9b-4fde-9254-c5041dbb69f5

STEPHEN C. SCHWARTZ, VOL. I

Page 2

1       A-P-P-E-A-R-A-N-C-E-S
2   For Plaintiff:
3   LAW OFFICES OF OLES, MORRISON, RINKER & BAKER, LLP
4   By:  J. Craig Rusk, Esq.
5   701 Pike Street, Suite 1700
6   Seattle, WA 98101
7   206/623-3427
8
9   For Defendants:
10  LAW OFFICES OF DAVISON & DAVISON
11  By:  Bruce E. Davison, Esq.
12  3351 Arctic Boulevard
13  Anchorage, AK 99503
14  907/563-6555
15
16  Also Present:
17  Mike Jens
18  Raymond H. R. Tide
19
    Reported by:
20
    Angela Peronto, CSR, RMR
21
    Summit Court Reporting, LLC
22
23
24
25

Page 3

1       I-N-D-E-X
2   EXAMINATION BY:              PAGE
3   Mr. Davison                    4
4
5
        E-X-H-I-B-I-T-S
6
    NUMBER              PAGE
7
    526  Various Documents           46
8
    527  Schwartz Expert Report       84
9
    528  Division 01 General Requirments   127
10       Section 01330 Submittal Procedures
11  529  Dick Pacific/Pert/Poong Lim Subcontract 170
12  530  Division 05 Metals, Section 05511   172
        Metal Stairs
13
    531  Exhibit 16.1-1           173
14
15
16
17
18
19     EXHIBIT ___4___
20
21
22     Page _2_ of _11_ Pages
23
24
25

Page 4

1   Anchorage, Alaska, Wednesday, 5/25/05, 9:00 A.M.
2               STEPHEN C. SCHWARTZ,
3   deponent herein, being sworn on oath by Angela
4   Peronto, was examined and testified as follows:
5               EXAMINATION
6   BY MR. DAVISON:
7       Q.   Good morning, Mr. Schwartz.  My name is
8   Bruce Davison.  I represent Dick Pacific/Ghemm Joint
9   Venture.
10          Who are you here on behalf of this
11  morning?
12      A.   I've been retained by Oles Morrison as
13  a consultant and expert on this matter; I guess
14  theoretically retained by Poong Lim Industrial.
15      Q.   Who is paying you for the services you
16  render in this case?
17      A.   My understanding is that Poong Lim is
18  paying me.  All of the checks have come, to date,
19  from Oles Morrison.
20      Q.   And do you have any sort of written
21  agreement or contract with either Oles Morrison or
22  Poong Lim regarding your services on this case?
23      A.   Not a contract per se.  But I have
24  provided Oles Morrison a couple of budget estimates
25  and a rate schedule.

Page 5

1       Q.   Are you working on behalf of Sejin in
2   this case?
3       A.   Technically I'm not sure, but I have
4   reviewed Sejin's documents and utilized them
5   and their performance -- examined their performance
6   as part of my duties.
7       Q.   Is there a contract between Sejin and
8   Poong Lim?
9       A.   As I recall, there was.
10      Q.   Have you reviewed that contract?
11      A.   I believe I saw it, but it was in
12  Korean with a few words translated.
13      Q.   Did you have the contract translated?
14      A.   No.
15      Q.   Did you discuss with anybody the terms
16  and conditions of that contract?
17      A.   Only the extent of the amount of the
18  original contract, and I believe there were a couple
19  of change orders attached to it that revised the
20  amounts.
21      Q.   All right.  Have you reviewed the
22  dispute of resolution provisions in that contract,
23  if any?
24      A.   As between?
25      Q.   Sejin and Poong Lim.

2  (Pages 2 to 5)

78201003-8b9b-4fde-9254-c5041dbb69f5

STEPHEN C. SCHWARTZ, VOL. I

Page 10

1  claims?
2      A.   They have claims for additional man
3  hours expended due to failure of Dick Pacific to
4  perform their agreed-upon obligations.
5      Q.   Well, I think you just conceded a
6  moment ago that Sejin does not have a contract with
7  Dick Pacific; correct?
8      A.   That's correct.
9      Q.   So what is the mechanism by which Sejin
10 can assert claims against Dick Pacific?
11     A.   Whatever passed-through obligations
12 Poong Lim may have against Dick Pacific.
13     Q.   And that in turn would be based on the
14 contract between Poong Lim and Sejin; correct?
15     A.   It would be based on all of the
16 understandings, contracts, and modifications to
17 those contracts between Poong Lim and Dick Pacific,
18 yes.
19     Q.   So the analysis and numbers that you
20 have prepared on behalf of Sejin, those are being
21 asserted against Poong Lim?
22     A.   My analysis of Poong Lim's performance
23 was characterized as my expectation or my review of
24 their performance and their impacts and the overruns
25 that I would expect from those impacts.  That's the

Page 11

1  extent of it.  I haven't attempted to characterize
2  it legally as -- or specifically as you're
3  characterizing it.
4      Q.   Well, as far as the analysis and
5  opinions you've rendered on behalf of the money that
6  is due -- you claim is due Sejin -- that would have
7  to be asserted against Poong Lim before Poong Lim
8  could assert that against Dick Pacific; correct?
9      A.   Well, first of all to clarify, I don't
10 believe that I quantified an amount of money due
11 Sejin by Poong Lim or by anybody.  I prepared an
12 analysis of what I would expect as overruns caused
13 by problems not anticipated by Poong Lim, problems
14 and circumstances -- Poong Lim or Sejin -- and
15 quantified what I would expect as a number of hours
16 overrun that would be attributable to those issues.
17 I didn't quantify it in terms of dollars.
18     Q.   Well, is it your expectation that
19 should Poong Lim be successful in recovering the
20 money it seeks from Dick Pacific, that part of that
21 money would flow back to Sejin?
22     A.   That's my understanding.
23     Q.   And in order for that to occur, Sejin
24 must have some sort of a contract claim being
25 asserted against Poong Lim; correct?

Page 12

1      A.   I would expect so, yes.
2      Q.   Doesn't that put you in a bit of a
3  conflict, sir, assuming that Sejin has asserted a
4  claim against Poong Lim, which you have quantified,
5  in the event that Poong Lim does not recover that
6  money from Dick Pacific on behalf of Sejin?
7      A.   That would be unfortunate.
8      Q.   Do you believe you're in a position of
9  conflict?
10     A.   No.
11     Q.   Do you even know if under the contract
12 between Sejin and Poong Lim, whether or not Sejin is
13 entitled to any additional compensation?
14     A.   No.  Well, let me -- again, since I
15 haven't been able to read the contract, I don't know
16 what their provisions are, and so the answer is no.
17     Q.   So you don't know what the contract
18 says.  Sejin has not prepared a claim.
19     A.   I didn't say that.  I said I have not
20 seen a claim.
21     Q.   You have not seen a claim, and you
22 don't know of the existence of any claim?
23     A.   I think you're mischaracterizing a
24 little bit what I said.  I have reviewed certain
25 claims of Sejin that were part of the Poong Lim

Page 13

1  change order requests.  Which part of those had been
2  prepared or submitted by Sejin to Poong Lim, I can't
3  say as we sit here today, and I don't know if I've
4  reviewed the entire file and to identify it, which
5  parts of those change order requests or claims were
6  prepared and in what form by Sejin.
7      Q.   How much does Sejin claim it is owed by
8  Poong Lim arising out of the Bassett project?
9      A.   I can't answer that as we sit here.
10     Q.   Do you have any idea?
11     A.   My recollection is in the change order
12 requests they were asking for something like 9 or
13 10,000 man hours additional.
14     Q.   You reviewed that change order request?
15     A.   Yes.
16     Q.   Is that partly the basis of the
17 opinions contained in your expert report?
18     A.   Not really.
19     Q.   Is the -- is the change order request
20 that you just identified, was that filed pursuant to
21 the contract between Poong Lim and Sejin?
22     A.   That's my understanding.  But you
23 characterize a change order request.  I believe
24 there are several.
25     Q.   Right.  There's several ones.

EXHIBIT       4

Page   3   of   11   Pages      SUMMIT COURT REPORTING 907/264-6776

78201003-8b9b-4fde-9254-c5041dbb69f5

STEPHEN C. SCHWARTZ, VOL. I

Page 14

1    A.   Yes.
2    Q.   Do you even know if the contract
3  between Sejin and Poong Lim allows for change order
4  requests?
5    A.   No.
6    Q.   Do you think that's important as far as
7  being able to assert claims on behalf of Sejin
8  against Dick Pacific?
9    A.   I don't know.
10    Q.   You don't know if it's important or
11  not?
12    A.   Not having seen the contract, I, you
13  know, whether the clauses or what clauses are in it.
14    Q.   Well, if there were no provision in the
15  contract for Sejin to assert a claim against
16  Poong Lim, wouldn't it be improper for Poong Lim to
17  assert a claim against Dick Pacific on behalf of
18  Sejin?
19         MR. RUSK:  Object to the extent it
20  calls for a legal conclusion.
21         THE WITNESS:  I don't believe that at
22  all.  I believe the absence of any language
23  regarding change order requests under a matter -- as
24  a matter of equity if you have revisions to an
25  agreement, you'd certainly have a right to pursue

Page 15

1  remedy or compensation for additional work.
2  BY MR. DAVISON:
3    Q.   Is that under Korean law or American
4  law?
5    A.   I believe -- again, I'm not going to
6  offer a legal conclusion, but I can't imagine any
7  law that would be -- prohibit seeking recovery from
8  impacts.
9    Q.   Do you have any knowledge of Korean law
10  that would support that conclusion?
11    A.   No.
12    Q.   The change orders that you just
13  described that you've reviewed; correct?
14    A.   Yes.
15    Q.   Is that -- are those change orders the
16  basis -- the sole basis of Poong Lim's claim against
17  Dick Pacific on behalf of Sejin?
18    A.   I don't know.
19    Q.   Well, do you know if Poong Lim is
20  seeking to recover money from Dick Pacific/Ghemm for
21  anything other than the change orders that you
22  understand Sejin has propounded to Poong Lim?
23    A.   I don't know.
24    Q.   Does your analysis of Sejin's asserted
25  recovery through Poong Lim against Dick Pacific

Page 16

1  depend on anything other than the change orders that
2  have been propounded by Sejin?
3    A.   My analysis is based on all of the
4  project documents that I reviewed, and I think as
5  characterizing my report an analysis, I subtract out
6  from my review and analysis those change order
7  requests.
8    Q.   Well, how do you know Sejin has
9  incurred any damages out of the Bassett project if
10  Sejin has not asserted a claim against Poong Lim?
11         MR. RUSK:  Objection; assumes facts not
12  in evidence.
13         THE WITNESS:  I'm not sure I
14  characterized your -- I know the damages that Sejin
15  has incurred for the overruns.  I did my own
16  separate analysis of what I would expect an overrun
17  to be under the circumstances.
18  BY MR. DAVISON:
19    Q.   How do you know that Sejin expects to
20  be compensated for those overruns?
21    A.   I asked them.
22    Q.   And who did you talk to about that?
23    A.   Y.S. Kim.
24    Q.   And he's asked you to assert claims on
25  behalf of Sejin against Poong Lim?

Page 17

1    A.   No.
2    Q.   All right.  How is it then that
3  Poong Lim can assert claims on behalf of Sejin if
4  Sejin has not made such a request?
5    A.   I don't know that they haven't made
6  such a request.
7    Q.   Have they made a request to you?
8         You just said they had not; correct?
9    A.   A request for me to do what?
10    Q.   Assert claims against Dick Pacific on
11  behalf of -- assert claims against Poong Lim on
12  behalf of Sejin.
13    A.   My assignment was to evaluate the
14  issues, the performance and the results, separate
15  and apart from who was asserting claims against who.
16  I was asked to evaluate the detailing performance
17  and the impacts to those performance and prepare an
18  evaluation of what I would expect would have been
19  the results and which were -- that answers the
20  question.
21    Q.   Would you agree with me, sir, that in
22  general, North American construction practices,
23  before a fabricator could assert a claim on behalf
24  of a detailer, the detailer must assert a claim
25  against the fabricator?

5  (Pages 14 to 17)

EXHIBIT        4
Page    4    of    11    Pages

78201003-8b9b-4fde-9254-c5041dbb69f5

STEPHEN C. SCHWARTZ, VOL. I

---

Page 18

1     A.   Generally, yes. Let me rephrase that.
2          The fabricator is responsible for the
3     detail. A good portion of the detailing is an
4     interaction between fabricator and detailer. The
5     fabricator -- the detailers are typically vendors,
6     not what I would call subcontractors. They're a
7     service provider. Whether performing under a
8     purchase order or subcontract, varies considerably.
9     In many cases they perform those functions under no
10    written agreement whatsoever.
11         But the fabricator himself has the
12    ability to analyze the total impacts to the
13    detailing process as well as the detailers do. And
14    it is not uncommon for them to do that. It's not
15    necessarily the norm.
16    Q.   Well, you're not saying that in this
17    situation that the fabricator is entitled to recover
18    damages on behalf of a subcontractor or
19    vendor/detailer that the detailer has not asserted
20    is due and owing, are you?
21    A.   No.
22    Q.   So if Sejin has not asserted a claim
23    against Poong Lim, then Poong Lim cannot assert a
24    claim against Dick Pacific on behalf of Sejin.
25         Would you agree with that?

---

Page 19

1          MR. RUSK:  Object to the form.
2          THE WITNESS:  That's a theoretical
3     question that you're asking me. And so that's the
4     question:  Are you asking me a theoretical question?
5     BY MR. DAVISON:
6     Q.   I'm just asking you the question
7     however you choose --
8     A.   Based on theory, I think that's a legal
9     conclusion. It would require a legal conclusion,
10    which I probably couldn't offer. To the extent that
11    it's my understanding that Poong Lim and Sejin do
12    have open issues, I would believe that Sejin has
13    open claims against Poong Lim.
14    Q.   How do you know what to assert on
15    behalf of Sejin as far as a claim against Poong Lim?
16    A.   My analysis, it wasn't based on knowing
17    how much or how. My analysis as stated was strictly
18    an evaluation of what I would expect as a, under the
19    circumstances, a compensable amount that would be
20    owing to Sejin by someone, based on their
21    understandings and their agreements to proceed.
22    Q.   So in your report when you have
23    analyzed the cost overruns of Sejin, your opinion is
24    is that is the amount of compensation due Sejin from
25    Poong Lim?

---

Page 20

1     A.   As a pass-through situation, yes.
2     Q.   What does that mean, a "pass-through
3     situation"?
4     A.   Well, the claims of Poong Lim are
5     passed through to Dick Pacific. The impacts as
6     claimed weren't due by Poong Lim. So by virtue --
7     Q.   Do you mean Sejin's?
8     A.   Sejin's claim -- Sejin had no contract
9     with Dick Pacific. So Sejin's claims would
10    technically be passed through Poong Lim to
11    Dick Pacific.
12    Q.   And would that be a function of the
13    contract between Poong Lim and Sejin, in your
14    experience?
15    A.   That would be a function of, in my
16    experience, the general relationship between a
17    vendor and subcontractor and the ultimate client or
18    the ultimate responsible party.
19    Q.   In the U.S. or in Korea?
20    A.   Everywhere. Well, I can't say with
21    Korea. In my experience in the U.S., that's
22    correct.
23    Q.   So as I understand your testimony then,
24    if -- even though if Dick Pacific had no contract
25    with Sejin, it is your belief and understanding that

---

Page 21

1     if Dick Pacific caused some impact to Poong Lim that
2     affected Sejin, Sejin would be entitled to assert a
3     claim through Poong Lim against Dick Pacific?
4     A.   I'm not sure I followed that. You
5     might try to state that question or read it back so
6     I can.
7     Q.   Your testimony is that you believe the
8     damages asserted on behalf of Sejin are in the form
9     of, to use your term, a pass-through claim against
10    Dick Pacific?
11    A.   You're -- I believe as I stated in my
12    report that Sejin was damaged during their
13    performance of the work on the project. And I did
14    an evaluation of what I would expect their overrun
15    to be. I don't know the total extent of the claims
16    for damages of Sejin or Poong Lim against DPG. So I
17    can't answer your question the way you're starting
18    to phrase it.
19    Q.   Well, I just want to understand, sir,
20    your opinion on this pass-through issue.
21         We've agreed that there's a -- the
22    basis of the relationship between Poong Lim and
23    Sejin is based on a contract; correct?
24    A.   No, I don't think we're agreed to that.
25    Q.   All right. Is there some other basis

---

EXHIBIT        4
Page      5      of     4     Pages

SUMMIT COURT REPORTING 907/264-6776

78201003-8b9b-4fde-9254-c5041dbb69f5

STEPHEN C. SCHWARTZ, VOL. I

Page 22

1  other than a contract that forms a relationship
2  between Poong Lim and Sejin for the Bassett project?
3      A.   My understanding on -- in -- with the
4  Korean way of doing business and contracting is a
5  lot of their understandings are unwritten and are
6  based on commitments, verbal agreements, and the
7  agreements of the parties to honor those
8  commitments.
9      Q.   You're in agreement with me that Sejin
10  does not have a contractual basis for suing
11  Dick Pacific directly?
12      A.   Not that I'm aware of.
13      Q.   So as I understand your testimony,
14  Sejin has asserted claims against Poong Lim in the
15  form of change order or other discussions; correct?
16      A.   That's my understanding.
17      Q.   And, in turn, Poong Lim has asserted
18  those claims against Dick Pacific/Ghemm; correct?
19      A.   I don't know.  I can't say to what
20  extent they have done it.  I know they have asserted
21  certain -- submitted certain change order requests
22  that involve Sejin.  But I don't know the extent
23  of -- the total extent of the claims that Poong Lim
24  has asserted against DPG that may involve Sejin.
25      Q.   So you're saying that the claims could

Page 23

1  be different than you have analyzed in your report?
2      A.   I haven't analyzed specifically the
3  claims of Poong Lim and Sejin.  I have reviewed the
4  change order requests.  But I have done an analysis
5  of what I would expect the overruns and the --
6  primarily the man hour overruns that I would
7  expected of Poong Lim and Sejin to incur based on
8  the performance -- their performance and the impacts
9  to their performance.
10      Q.   You've segregated those numbers in your
11  report; correct?
12          As we sit here today, you can tell me
13  by reviewing your report how much you believe Sejin
14  should be compensated for extra work or extra man
15  hours or impact it occurred on this project;
16  correct?
17      A.   I could say -- yes, with respect to man
18  hours.
19      Q.   And it's your opinion that somebody
20  other than Poong Lim is liable for those man hour
21  overruns?
22      A.   Yes.
23      Q.   And --
24      A.   The man hour overruns that I have
25  developed, not their total man hour overruns.

Page 24

1      Q.   Understood.
2          You haven't looked at the other change
3  orders in the context of your man hour evaluations?
4      A.   I've subtracted the other change order
5  requests from my evaluations where it was
6  appropriate to subtract them.
7      Q.   And it's your understanding -- and I
8  think you agreed with me that because Sejin has no
9  contract with Dick Pacific, that in order for Sejin
10  to recover for those extra man hours that you've
11  calculated and evaluated in your report, that claim
12  for extra man hours must first be asserted against
13  Poong Lim, and then Poong Lim can pass through that
14  claim to Dick Pacific.
15          Is that your -- is that what you've
16  said?
17      A.   I don't think I've said that at all.
18      Q.   Let me try the question this way.
19          Poong Lim subcontracted out the
20  detailing and shop drawings to Sejin; correct?
21      A.   They have an agreement to prepare shop
22  drawings -- or agreement for preparation of shop
23  drawings.  Whether you'd characterize it as a
24  subcontract or a purchase order, I'm not sure what
25  the document said it was.

Page 25

1      Q.   Poong Lim and Sejin are two different
2  entities, are they not?
3      A.   Yes.
4      Q.   The same -- comparable to the industry
5  in the U.S. where one business perhaps is a
6  fabrication business and when they're performing
7  fabrication work, they might subcontract out or send
8  a purchase order or enter into some agreement with
9  another business or company that provides shop
10  drawings?
11      A.   Yes, sir.  I'm not in disagreement with
12  the order of things that you're talking about, but
13  it's the term "subcontract" that I've having
14  difficulty with.
15      Q.   All right.  Let me just use the term
16  "contract" then.
17      A.   As long as that word is encompassing --
18  is a generality that encompassed agreements, oral
19  agreements, purchase orders, whatever, you can say
20  that.  The word agreement would probably be better.
21  But you can use whatever you like as long as we
22  understand that it's --
23      Q.   All right.  Now, do you agree with me
24  that in order for Sejin to be compensated for what
25  it feels were extra hours incurred outside or in

EXHIBIT ___4___
Page ___6___ of ___11___ Pages

SUMMIT COURT REPORTING 907/264-6776

78201003-8b9b-4fde-9254-c5041dbb69f5

Page 26

1  addition to what the agreement or contract between
2  Sejin and Poong Lim acquired, that the claim for
3  extra hours must be asserted against Poong Lim as
4  opposed to Dick Pacific?
5      MR. RUSK: Object to the extent it
6  calls for a legal conclusion.
7      THE WITNESS: I think that's kind of a,
8  either a complex or a compound question. I'm trying
9  to think of the answer. But the first part of it, I
10  would have to answer I don't know what the
11  understanding is between Poong Lim and Sejin as far
12  as what Poong Lim might do to compensate Sejin for
13  their additional hour overruns, irrespective of a
14  claim or collection against Dick Pacific. So I
15  can't speak to that.
16  BY MR. DAVISON:
17      Q.  You used the term earlier,
18  "pass-through."
19      A.  Yes.
20      Q.  All right. Does that mean that
21  whatever claims Sejin has against Poong Lim, that
22  Poong Lim is passing through those claims to
23  Dick Pacific?
24      A.  As I understand with respect to the
25  change order request, Poong Lim is, in fact, passing

Page 27

1  through certain claims of Sejin to Dick Pacific.
2      Q.  Now, what about the analysis you did of
3  extra hours that Sejin allegedly incurred in this
4  project, are those extra hours not also a
5  pass-through claim through Poong Lim to
6  Dick Pacific?
7      A.  I don't know what has been done with
8  the extra hours or the hours per my evaluation,
9  whether they've been claimed against Poong Lim or
10  claimed against Dick Pacific or anyone.
11      Q.  Well, I mean, the extra hours that
12  Poong Lim incurred -- excuse me -- that Sejin
13  incurred, you have said in your report are the
14  responsibility of Dick Pacific/Ghemm to pay for;
15  correct?
16      A.  I've asserted in my report that those
17  additional hours are the responsibility of the
18  actions or inactions of Dick Pacific. I don't know
19  whether they've been submitted as a claim against
20  Dick Pacific or not.
21      Q.  Would you consider a lawsuit to be a
22  claim?
23      A.  Certainly. But I don't know what -- I
24  don't believe I've ever read the complaint itself to
25  even know what Dick Pacific -- or what Poong Lim has

Page 28

1  asserted in its totality against Dick Pacific.
2      Q.  Let me just see if we can summarize it.
3      If Poong Lim is entitled to additional
4  compensation for its contract, whether it's through
5  change order or claims for extra hours of the nature
6  you've described in your report, don't we have to
7  characterize those claims as pass-through claims in
8  order for Poong Lim to be able to assert those
9  against Dick Pacific?
10      MR. RUSK: Object to the extent it
11  calls for a legal conclusion.
12      THE WITNESS: I don't have a good
13  answer for that because I don't know -- if we're
14  talking theoretically, I don't know what the end
15  result was of those numbers of man hour overruns
16  that I came up with, whether they're even being
17  submitted as a claim against Dick Pacific or not.
18  BY MR. DAVISON:
19      Q.  If they were, would they be submitted
20  in the context of a pass-through claim?
21      A.  From Sejin?
22      Q.  Yes.
23      A.  I suppose so.
24      Q.  And the reason that you would
25  characterize those as pass-through claims is because

Page 29

1  it's your belief that Dick Pacific caused Sejin to
2  incur those extra hours?
3      A.  Yes.
4      Q.  Now, would you agree with me that if it
5  was the Corps of Engineers that caused Dick Pacific
6  to cause Poong Lim to cause Sejin to incur the extra
7  hours, that Dick Pacific could assert a pass-through
8  claim against the Corps?
9      MR. RUSK: Object to the extent it
10  calls for a legal conclusion.
11      THE WITNESS: Potentially, but I don't
12  know where -- you know, it depends on what the
13  contract said and what the matter of law is as far
14  as who would be responsible. If the Corps was ruled
15  to be responsible for those claims and they paid
16  them, yes, I guess Dick Pacific wouldn't have to.
17  BY MR. DAVISON:
18      Q.  What, sir, was your scope of work for
19  the expert services that you are providing in this
20  case?
21      A.  Well, it was several-fold, but
22  ultimately to prepare a report analyzing the
23  required work under the agreement between Poong Lim
24  and DPG, evaluate impacts to that performance, and
25  to evaluate the results or the damages that I would

Page 225

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA for the use
of POONG LIM/PERT JOINT VENTURE,

       Plaintiff,

vs.

DICK PACIFIC/GHEMM JOINT VENTURE,
CONTINTENTAL CASUALTY COMPANY,
NATIONAL FIRE INSURANCE CO. OF
HARTFORD, SEABOARD SURETY CO.,
and ST. PAUL FIRE AND MARINE
INSURANCE COMPANY,

       Defendants.
_____/

Case No. A03-0290 Civil


DEPOSITION OF STEPHEN C. SCHWARTZ

VOLUME II

Pages 225 - 348, inclusive

Thursday, May 26, 2005, 1:30 P.M.



Taken by Counsel for Defendants

at

Law Offices of Oles, Morrison, Rinker & Baker, LLP

745 W. Fourth Avenue, Suite 502

Anchorage, Alaska

EXHIBIT _____ 4
Page _____ 8 _____ of _____ N _____ Pages

STEPHEN C. SCHWARTZ, VOL. II

| Page 226 |
|---|
| 1 A-P-P-E-A-R-A-N-C-E-S |
| 2 For Plaintiff: |
| 3 LAW OFFICES OF OLES, MORRISON, RINKER & BAKER, LLP |
| 4 By: J. Craig Rusk, Esq. |
| 5 701 Pike Street, Suite 1700 |
| 6 Seattle, WA 98101 |
| 7 206/623-3427 |
| 8 |
| 9 For Defendants: |
| 10 LAW OFFICES OF DAVISON & DAVISON |
| 11 By: Bruce E. Davison, Esq. |
| 12 3351 Arctic Boulevard |
| 13 Anchorage, AK 99503 |
| 14 907/563-6555 |
| 15 |
| 16 Reported by: |
| 17 Angela Peronto, CSR, RMR |
| 18 Summit Court Reporting, LLC |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |

**Page 228**

1 Anchorage, Alaska, Thursday, 5/26/05, 1:30 P.M.
2 STEPHEN C. SCHWARTZ,
3 deponent herein, being previously sworn on oath by
4 Angela Peronto, was examined and testified as
5 follows:
6 EXAMINATION
7 BY MR. DAVISON:
8 Q. The witness is still under oath;
9 correct?
10 Will the witness acknowledge --
11 A. Yes.
12 Q. -- you understand you're still under
13 oath?
14 A. Yes, sir.
15 Q. Would you get your report, please,
16 Exhibit 527. Turn, if you would, to Exhibit 24 of
17 your report.
18 Do you recall Exhibit 24 from
19 yesterday?
20 A. Yes, sir.
21 Q. If you would, sir, would you -- now,
22 this email is from Larry Johnson to Rick Jensen;
23 correct?
24 A. I assume so.
25 Q. And I believe you testified yesterday

**Page 227**

1 I-N-D-E-X
2 EXAMINATION BY: PAGE
3 Mr. Davison 228
4
5
6
7
8
9
10
11 E-X-H-I-B-I-T-S
12 NUMBER PAGE
13 536 Bassett Hospital "ABC" Contract 286
Cost List
14
15
16
17
18
19
20 EXHIBIT 4
21
22 Page 9 of 11 Pages
23
24
25

**Page 229**

1 that you relied upon this email to support
2 Poong Lim's contention that there was a two-week
3 turnaround on shop drawings.
4 Do you recall that testimony?
5 A. I recall my testimony regarding that
6 there was other documents in this -- and this is a
7 document in this report that confirmed the
8 understanding of the two-week turnaround, yes.
9 Q. Look in the very first line after the
10 salutation there, "Rick," where it says, "Please
11 consider our statement in Korea that we -- I'm
12 emphasizing we -- would require two weeks to return
13 posted shop drawings basically as an overly
14 optimistic commitment."
15 In your opinion, Mr. Schwartz, who does
16 the "we" refer to?
17 A. I would only be speculating, but I
18 would suspect that Larry Johnson was referring to
19 HKS.
20 Q. Thank you.
21 Now go to the next paragraph, paragraph
22 1, where Mr. Johnson offers an explanation of
23 why HKS was overly optimistic.
24 Do you see that paragraph 1?
25 Would you please read it to yourself.

2 (Pages 226 to 229)

d260828d-d4cd-4158-a340-98469e11c8c2

Page 242

1    But that submittal was submitted by
2  hand to HKS in Korea is my understanding or to DPG
3  in Korea, that initial submittal that you looked at.
4    Q.   But do you know the first date that
5  submittals were made by Poong Lim to the Project
6  Point web site?
7    A.   No.  I would only be speculating.  On
8  the submittals, what I call -- the numbering on the
9  left-hand column, just for anyone's information, I
10  created so I could sort these.
11    Q.   Under submittal number?
12    A.   Under submittal number, those are my
13  numbers.
14    And as I recall, the next submittal,
15  whether it would be named as 2.1, the 5202 submittal
16  was the first one sent to Dallas -- or sent to the
17  web site.
18    Q.   Now, what's the significance of the
19  date under the Date Approved column?
20    A.   That's the date in Poong Lim's record
21  that they received the drawing or they recognized it
22  as being received.  They either found it on the web
23  site or whatever.
24    Q.   Received and approved by the engineer
25  of record?

Page 243

1    A.   The return date.
2    Q.   Now, if there were -- if there was more
3  than one submittal, there would be more than one
4  return date; correct?
5    Let me strike that.  That was a poorly
6  worded question.
7    For a given shop drawing, there might
8  be more than one submittal before it's approved by
9  the engineer of record; correct?
10    A.   That's correct.
11    In answer to your question, that column
12  should be headed Date of Return.
13    Q.   Of which shop drawing, if there were
14  multiple submittals of a shop drawing?
15    A.   This is a summary of the original shop
16  drawing structural submittals.
17    Q.   Well, I still don't understand what the
18  date of return means.
19    Is that the final approval by the
20  engineer of record so that the shop drawing can be
21  released for fabrication?
22    A.   That's the date that that original
23  submittal, the drawings in that submittal, were
24  returned to Poong Lim.
25    Whether it was approved -- I don't

Page 244

1  think they were -- or approved with corrections
2  noted or sent "revise and resubmit," that's the date
3  they were returned to Poong Lim.
4    I have not gone into an analysis of
5  when final drawings were ultimately approved by or
6  accepted as approved by anybody.
7    Q.   Take a look at what you've labeled
8  Submittal No. 7.1, 7.2, 7.3, and 7.4.
9    A.   Yes.
10    Q.   Now, under 7.1, you've listed 85
11  sheets?
12    A.   Yes.
13    Q.   And you've got the date of submittal is
14  05/25/02?
15    A.   Yes.
16    Q.   And you've got the date of return,
17  which is the corrected heading for that column, as
18  06/28/02?
19    A.   Yes.
20    Q.   What was the state of the drawings that
21  were returned on 06/28/02?
22    A.   Without looking at each individual
23  drawing, I don't know.
24    Q.   Could some of the drawings have
25  required resubmittal by Poong Lim to the engineer of

Page 245

1  record?
2    A.   Possibly.
3    Q.   So this date under date of return, as I
4  understand your testimony, is the date of the first
5  return by the engineer of record and does not
6  account for whether the drawing has to be
7  resubmitted to the engineer of record; is that
8  correct?
9    A.   That's correct.
10    Q.   And then the second document in this
11  exhibit, what information does that intend to
12  convey?
13    A.   It's simply a graphical representation
14  of the data on the spreadsheet.
15    Q.   Turn, if you would, sir, to Exhibit 20
16  of your expert report.  That's a one-page
17  spreadsheet titled, Bassett Hospital replacement
18  detailing manhour summary, dash -- estimate and
19  actual; is that correct?
20    A.   Yes.
21    Q.   What's the purpose of this exhibit?
22    A.   I asked Y.S. Kim of Sejin detailing to
23  provide me the best information that he had
24  available in different categories of activity of
25  what his estimated hours were and if he knew what

EXHIBIT   4

Page  lo  of  h

Page 246

1 his actual hours were expended for those tasks.
2     I created the blank sheet, and under
3 "Comments," Sejin detailing provided the comments
4 and all the numbers.
5     Q.  So none of this data is your original
6 data?
7     A.  The numbers are not my numbers.  They
8 were entered into the sheet by, I presume, Y.S. Kim
9 at Sejin.
10     Q.  And the comments, who prepared the
11 comments?
12     A.  Sejin or Poong Lim.  I believe it was
13 Sejin detailing.
14     Q.  And where are the documents that you
15 relied upon to prepare Exhibit 20?
16     A.  I didn't prepare Exhibit 20.  I
17 prepared the blank sheet and emailed it to Sejin,
18 and Sejin emailed it back to me -- or Poong Lim
19 emailed it back to me with that information filled
20 in.
21     Actually, I take that back.  I handed
22 it to them in November in Seattle, this blank sheet,
23 on a flash drive.  He put it on his computer, and it
24 was returned to me in this form completed.
25     Q.  So this Exhibit 20 was not prepared by

Page 247

1 you.  It was prepared by Sejin?
2     A.  The data in the exhibit was prepared by
3 Sejin.  It was provided by Sejin in a form, and a
4 blank form filled out or prepared by me.
5     Q.  Well, let's look at the first line item
6 there, building sequence No. 1 to No. 4, structural
7 steel.
8     There's the No. 7,000?
9     A.  Yes.
10     Q.  What does that number mean?
11     A.  If Sejin correctly interpreted my
12 request to have for building sequence 1 to 4
13 structural steel, the estimated detailing hours he
14 wrote in there, 7,000, was his estimated detailing
15 hours for structural steel building sequence 1 to 4.
16     Q.  Let me just be clear.
17     This information came from Mr. Kim at
18 Sejin?
19     A.  I believe so, yes.
20     Q.  Not from Poong Lim?
21     A.  That's my recollection.
22     Q.  Now, what information did you look at
23 to verify the accuracy of the 7,000 estimated
24 detailing labor hours under entry No. 1 there?
25     A.  Nothing.

Page 248

1     Q.  Is that true of the remainder of the
2 numbers in the column, estimated detailing labor
3 hours?
4     A.  Yes, sir.
5     Q.  Now, the next column, actual detailing
6 labor hours.
7     Are you relying completely and totally
8 upon the numbers furnished by Mr. Kim at Sejin?
9     A.  For the individual elements of the
10 work, yes, although the manhour expenditures by
11 Sejin totaled approximately this 52,974 hours, if I
12 recall.
13     So there's another document that
14 matches that number.  Approximately.
15     Q.  Is that document contained in your
16 report?
17     A.  As I recall, it is.
18     Q.  What exhibit would that be?
19     A.  42, maybe.
20     Q.  So do I understand your testimony to be
21 that Exhibit 20 was prepared independently of
22 Exhibit 42?
23     A.  Exhibit 20 was filled in, the numbers
24 were filled in by Sejin detailing.  I don't know
25 whether it was prepared independently of that sheet.

Page 249

1     Q.  Where did you get Exhibit 42?
2     A.  From the documents in the Oles Morrison
3 document room.
4     Q.  And what -- why is Exhibit 42 important
5 to your report?
6     A.  It provides the only basis that I have
7 for the total manhours expended for detailing and
8 when it was expended.
9     Q.  Have you looked at any data that would
10 support or verify or substantiate the information
11 shown in Exhibit 42?
12     A.  No specific data, no.
13     Q.  Are you, sir, as we sit here today as
14 you're testifying under oath, are you testifying to
15 the accuracy of any of the numbers in Exhibit 42?
16     A.  No, only to the extent that both
17 Y.S. Kim and one of his lead guys that helped put
18 this together said it was accurate to the best of
19 their knowledge.
20     Q.  Now, did you review any other
21 accounting data from Sejin -- I'm going back to
22 Exhibit No. 20 -- to verify that, in fact, Sejin
23 kept track of hours according to the different areas
24 listed under the item count?
25     A.  No, I haven't seen any written data.

# JORDAN ROSENFELD

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA for the
use of POONG LIM/PERT JOINT VENTURE,

       Plaintiff,

vs.

DICK PACIFIC/GHEMM JOINT VENTURE,
CONTINTENTAL CASUALTY COMPANY,
NATIONAL FIRE INSURANCE CO. OF
HARTFORD, SEABOARD SURETY CO.,
and ST. PAUL FIRE AND MARINE
INSURANCE COMPANY,

       Defendants.

_____/

Case No. A03-0290 Civil

DEPOSITION OF JORDAN ROSENFELD

Pages 1 - 126, inclusive

Tuesday, May 31, 2005, 9:35 A.M.

Taken by Counsel for Defendants

at

Law Offices of Oles, Morrison, Rinker & Baker, LLP

745 W. Fourth Avenue, Suite 502

Anchorage, Alaska

EXHIBIT ___5___
Page___1___ of ___4___ Pages

JORDAN ROSENFELD

---

**Page 2**

```
 1          A-P-P-E-A-R-A-N-C-E-S
 2  For Plaintiff:
 3  LAW OFFICES OF OLES, MORRISON, RINKER & BAKER, LLP
 4  By:  Julia M. I. Holden, Esq.
 5  745 West Fourth Avenue, Suite 502
 6  Anchorage, AK 99501
 7  907/258-0106
 8
 9  For Defendants:
10  LAW OFFICES OF DAVISON & DAVISON
11  By:  Joseph A. Pollock, Esq.
12  3351 Arctic Boulevard
13  Anchorage, AK 99503
14  907/563-6555
15
16  Also Present:
17  Michael R. Hanrahan
18
    Reported by:
19
    Angela Peronto, CSR, RMR
20
    Summit Court Reporting, LLC
21
22
23
24
25
```

**Page 3**

```
 1          I-N-D-E-X
 2  EXAMINATION BY:           PAGE
 3  Mr. Pollock            4
 4
 5
 6
 7
          E-X-H-I-B-I-T-S
 8
    NUMBER                 PAGE
 9
    537  Rosenfeld Expert Opinion Report 6
10
    538  Jens Expert Report Rebuttal    7
11
    539  Handwritten Notes          15
12
    540  Sutor Consulting Invoices     24
13
    541  Bassett Hospital "ABC" Contract 51
14       Cost List
15  542  Poong Lim/Seijin Agreement    80
16  543  Profit Markup Summary       94
17  544  Bassett Hospital Project     94
         Replacement Spreadsheet
18
    545  Non-Consolidated Financial   105
19       Statements/Excerpt
20  546  Monthly Structural Steel     111
         Payroll Summary
21
    547  Status of Manhour Analysis   114
22
    548  Manhour by Trade          117
23
    549  12-11-04 Letter to Gun Lee    118
24       from Jordan Rosenfeld
25
```

**Page 4**

```
 1
 2  Anchorage, Alaska, Tuesday, 5/31/05, 9:35 A.M.
 3          JORDAN ROSENFELD,
 4  deponent herein, being sworn on oath by Angela
 5  Peronto, was examined and testified as follows:
 6          EXAMINATION
 7  BY MR. POLLOCK:
 8      Q.   Mr. Rosenfeld, we met before the
 9  deposition.  My name is Joe Pollock.  I'm an
10  attorney for Dick Pacific/Ghemm joint venture and
11  the four Miller Act sureties in the Poong Lim/Pert
12  case.
13          Today is the day that has been
14  scheduled for your deposition surrounding the expert
15  report that you've prepared in this case.
16          Have you had your deposition taken
17  before?
18      A.   Yes, I have.
19      Q.   How many times?
20      A.   About 25, maybe 30 times.
21      Q.   And of those depositions, how many were
22  in the furtherance of providing expert testimony?
23      A.   Most of them, probably all but one or
24  two.
25      Q.   So you're familiar with the process, as
```

**Page 5**

```
 1  far as how a deposition works?
 2      A.   Yes.
 3      Q.   Okay.  I'll be asking you a series of
 4  questions.  You're under oath, and the testimony you
 5  provided today can be used in the litigation that's
 6  pending here in federal district court.
 7          If you don't understand a question that
 8  I ask, please just let me know, and I'll rephrase
 9  the question.  But it's important that you
10  understand the question.
11          We're also trying to prepare a written
12  transcript of your verbal testimony today.  So it's
13  important that you answer yes or no as opposed to
14  uh-huh or huh-uh, that we might in casual
15  conversation.
16          It's also important that you allow me
17  to complete my question before you answer so that
18  the transcript is clear as to who is talking at a
19  given time.
20          Those are the basic ground rules.
21  We'll take a series of breaks.  I think we're
22  scheduled for a three-hour deposition today.  I
23  think we'll take a break every 45 minutes to an
24  hour.  But for whatever reason, if you need to take
25  a break, let me know, and we'll take a break.
```

EXHIBIT ___5___

Page ___2___ of ___4___ Pages

SUMMIT COURT REPORTING 907/264-6776

5435028e-1249-4e3e-b3b1-42ec21b50d77

JORDAN ROSENFELD

Page 74

1 to the original contract, taking the difference, and
2 saying that's your damages?
3     Q.   Yes.
4     A.   For the subcontractors.  That -- yes.
5     Q.   That would be a total cost analysis in
6 your view?
7     A.   Yes.
8     Q.   Okay.
9         So I guess my question again is what
10 damages did Poong Lim suffer if it paid its
11 subcontract laborers on a unit-price-per-ton basis?
12 What damages did Poong Lim suffer for that work?
13     MS. HOLDEN:  Objection, assumes facts
14 not in evidence.
15     THE WITNESS:  Yeah, I guess I can't
16 answer the question.  Because obviously if it was
17 just on a unit-price-per-ton and the tons were the
18 same, the subcontract amounts wouldn't have gone up.
19 And it's obvious from the schedule, they did go up.
20 So I just -- I don't see any basis for your
21 question.
22 BY MR. POLLOCK:
23     Q.   You have no reason -- you have no
24 understanding of why the contract amounts went up;
25 correct?

Page 75

1     A.   Correct.
2     Q.   And you're not sure whether the
3 subcontract laborers were paid -- companies were
4 paid on a unit-price-per-ton basis; correct?
5     A.   Correct.
6     Q.   Assuming that they were paid on a
7 unit-price-per-ton basis, and that Poong Lim paid
8 them the unit price for the work that they
9 performed, what, if any, damages, in your view,
10 would Poong Lim have suffered as a result -- what,
11 if any, damages would Poong Lim have suffered?
12     A.   Again, they suffered for the extra
13 costs they incurred paying the subcontractors.  And they did
14 however they arrived at that amount.  And they did
15 incur extra costs.
16     Q.   And you would agree that the -- what
17 would be the Sejin hourly rate?  How did you arrive
18 at the Sejin hourly rate?
19     A.   Well, in the report the Sejin hourly
20 rate determines the cost per ton -- I mean, the
21 hours per ton and then multiplies that times the
22 budgeted hours.
23         This is one of the items that has been
24 changed in the schedules, the new schedules we've
25 given you.  It has a different estimated hours.  It

Page 76

1 is now about 17,000 hours.  So the rate has been
2 reduced.
3     Q.   Why did the number change?
4     A.   Based on new information I received
5 from Mr. Schwartz as to what the original estimate
6 of the hours was for the detailing.
7     Q.   Did you -- so for, if you start up on
8 the top, you took the Sejin subcontract amount of
9 325,000 wons; correct?
10     A.   Correct.
11     Q.   And the contract tonnage.  And those
12 items were -- those numbers were derived from the
13 Sejin subcontract?
14     A.   Yes.
15     Q.   And the estimated hours of 14,000 hours
16 changing to 17,000 hours, where did that number come
17 from?
18     A.   The 14,000 or the 17?
19     Q.   Either one.
20     A.   The 14,000 came from a schedule that
21 was provided by Poong Lim, a summary they had.  The
22 17,000, as I said, was a schedule I received from
23 Mr. Schwartz.
24     Q.   Did you ever discuss with anyone from
25 Sejin their estimate relative to the hours that they

Page 77

1 planned to expend in detailing the project?
2     A.   I didn't, because Mr. Schwartz was
3 having that discussion with him.
4     Q.   Did you -- what was your understanding
5 with talking to Mr. Schwartz regarding Sejin's
6 estimate of detailing hours?
7     A.   I can't recall at this point.  I think
8 when he provided me the schedule, he went through
9 that schedule so he could give me -- tell me what
10 the hours were for the original estimate of the
11 detailing.
12     Q.   Was that schedule --
13     A.   I --
14     Q.   I'm sorry.  Go ahead.
15     A.   Other than that, I can't remember what
16 else we discussed.
17     Q.   Was that schedule contained in
18 Mr. Schwartz's report?
19     A.   I don't believe it was.  I can't say.
20 I can't remember everything that was in his report.
21     Q.   Did you ever review a Sejin estimate
22 for the work --
23     A.   No.
24     Q.   -- for the detailing?
25     A.   No.

EXHIBIT     5

Page   3   of   4

20  (Pages 74 to 77)

5435028e-1249-4e3e-b3b1-42ec21b50d77

## JORDAN ROSENFELD

Page 78

1    Q.    So in -- is it accurate that in the
2  14,000- or the 17,000-hour figure, those hours came
3  exclusively from -- were either provided to you by
4  Mr. Schwartz or by Poong Lim; is that correct?
5    A.    Correct.
6    Q.    Did you perform any independent
7  investigation to determine the reasonableness of
8  those estimated hours?
9    A.    No.
10    Q.    Is your answer the same as to the
11  estimated tonnage, the 4,422?
12    A.    Well, the tonnage is right off of the
13  contract. So that could be verified, though the
14  tonnage doesn't figure into my revised calculation
15  at all.
16    Q.    And the estimate hours per ton, is that
17  a mathematical function?
18    A.    Yes.
19    Q.    Based on which two numbers?
20    A.    That would be the 14,000 hours divided
21  by the 4400 tons.
22    Q.    And the contract hours, where did that
23  number come from?
24    A.    That would be the $3.20 hours per ton
25  times 4,499 tons.

Page 79

1    Q.    Mr. Rosenfeld, we've handed you what
2  has been identified as Exhibit --
3    A.    527.
4    Q.    527 to this series of depositions.
5  Have you seen this report before?
6    A.    I have not seen this whole binder
7  before.
8    Q.    What do you believe this report is?
9    A.    It's Mr. Schwartz's expert report.
10    Q.    Can you please take a look at Exhibit
11  20, please. Have you seen Exhibit 20 before?
12    A.    Yes.
13    Q.    What do you believe Exhibit 20 to be?
14    A.    It's a detailing manhour summary.
15    Q.    Did you say you'd seen this before?
16    A.    Yes.
17    Q.    The estimated detailing labor hours are
18  identified as 21,000 and change; correct?
19    A.    Yes.
20    Q.    But your estimate hours in your report
21  are approximately 14,000 and change; correct?
22    A.    That's in my initial report, yes.
23    Q.    Do you have an explanation of the
24  discrepancies between those two numbers?
25    A.    Well, part of the 21,000 is for items

Page 80

1  not included in the 325-million-won contract amount.
2    Q.    Which items are those?
3    A.    The items that are not or are in
4  included? Well, let's -- the ones that are included
5  would be the first two items for 7,000 hours, 9500
6  hours, and the last item of 500 hours. The other
7  three are not.
8    Q.    Steel stairs, exterior wall supports,
9  and erection aids, it's your understanding that
10  those amounts are not included in the 325,000?
11    A.    Yes.
12    Q.    Are you aware of any other
13  discrepancies that would --
14    A.    No.
15    Q.    -- justify the difference between the
16  two numbers?
17    A.    No.
18          (Exhibit 542 marked.)
19  BY MR. POLLOCK:
20    Q.    Mr. Rosenfeld, we've handed you what
21  has been identified as Exhibit 542 to your
22  deposition. Have you seen this document before?
23    A.    Yes.
24    Q.    And what is this document?
25    A.    This is the agreement between Poong Lim

Page 81

1  and Sejin.
2    Q.    And, in looking through this sequence
3  of documents, does this lead you to conclude that
4  exterior wall supports, stairs, steel stairs, and
5  erection aids are or are not included in the
6  $325,000 number?
7    A.    I don't know.
8    Q.    If the estimated hours -- if, in
9  looking at your report on page 3 and your cost per
10  hour for Sejin, if the estimated hours were higher,
11  what would the effect of that be on the contract
12  rate -- contract dollar per hour?
13    A.    That would lower the rate.
14    Q.    And how much did Sejin get paid? Do
15  you know?
16    A.    I don't know the answer to that
17  offhand.
18    Q.    Take a look at your gross profit
19  analysis sheet attached to your report, item 766,
20  outsourcing design. Do you see that number?
21    A.    Yes.
22    Q.    Do you think that the category,
23  outsourcing design, No. 766, with a total of 311,000
24  through 2003, do you believe that that is the amount
25  that Poong Lim paid to Sejin for detailing?