Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA for the use
of POONG LIM/PERT JOINT VENTURE,

    Plaintiff,

vs.

DICK PACIFIC/GHEMM JOINT VENTURE,
CONTINTENTAL CASUALTY COMPANY,
NATIONAL FIRE INSURANCE CO. OF
HARTFORD, SEABOARD SURETY CO.,
and ST. PAUL FIRE AND MARINE
INSURANCE COMPANY,

    Defendants.
_____/
Case No. A03-0290 Civil

DEPOSITION OF STEPHEN C. SCHWARTZ

VOLUME I

Pages 1 - 224, inclusive

Thursday, May 25, 2005, 9:00 A.M.

Taken by Counsel for Defendants

at

Law Offices of Oles, Morrison, Rinker & Baker, LLP

745 W. Fourth Avenue, Suite 502

Anchorage, Alaska

EXHIBIT 4
Page 1 of 11 Pages

STEPHEN C. SCHWARTZ, VOL. I

### Page 2

```
 1        A-P-P-E-A-R-A-N-C-E-S
 2  For Plaintiff:
 3  LAW OFFICES OF OLES, MORRISON, RINKER & BAKER, LLP
 4  By: J. Craig Rusk, Esq.
 5  701 Pike Street, Suite 1700
 6  Seattle, WA 98101
 7  206/623-3427
 8
 9  For Defendants:
10  LAW OFFICES OF DAVISON & DAVISON
11  By: Bruce E. Davison, Esq.
12  3351 Arctic Boulevard
13  Anchorage, AK 99503
14  907/563-6555
15
16  Also Present:
17  Mike Jens
18  Raymond H. R. Tide
19
    Reported by:
20
    Angela Peronto, CSR, RMR
21
    Summit Court Reporting, LLC
22
23
24
25
```

### Page 3

```
 1              I-N-D-E-X
 2  EXAMINATION BY:              PAGE
 3  Mr. Davison              4
 4
 5
              E-X-H-I-B-I-T-S
 6
    NUMBER                       PAGE
 7
    526  Various Documents        46
 8
    527  Schwartz Expert Report   84
 9
    528  Division 01 General Requirments   127
10       Section 01330 Submittal Procedures
11  529  Dick Pacific/Pert/Poong Lim Subcontract 170
12  530  Division 05 Metals, Section 05511   172
         Metal Stairs
13
    531  Exhibit 16.1-1           173
```

EXHIBIT 4
Page 2 of 11 Pages

### Page 4

```
 1  Anchorage, Alaska, Wednesday, 5/25/05, 9:00 A.M.
 2             STEPHEN C. SCHWARTZ,
 3  deponent herein, being sworn on oath by Angela
 4  Peronto, was examined and testified as follows:
 5             EXAMINATION
 6  BY MR. DAVISON:
 7      Q.   Good morning, Mr. Schwartz. My name is
 8  Bruce Davison. I represent Dick Pacific/Ghemm Joint
 9  Venture.
10           Who are you here on behalf of this
11  morning?
12      A.   I've been retained by Oles Morrison as
13  a consultant and expert on this matter; I guess
14  theoretically retained by Poong Lim Industrial.
15      Q.   Who is paying you for the services you
16  render in this case?
17      A.   My understanding is that Poong Lim is
18  paying me. All of the checks have come, to date,
19  from Oles Morrison.
20      Q.   And do you have any sort of written
21  agreement or contract with either Oles Morrison or
22  Poong Lim regarding your services on this case?
23      A.   Not a contract per se. But I have
24  provided Oles Morrison a couple of budget estimates
25  and a rate schedule.
```

### Page 5

```
 1      Q.   Are you working on behalf of Sejin in
 2  this case?
 3      A.   Technically I'm not sure, but I have
 4  reviewed Sejin's documents and have utilized them
 5  and their performance -- examined their performance
 6  as part of my duties.
 7      Q.   Is there a contract between Sejin and
 8  Poong Lim?
 9      A.   As I recall, there was.
10      Q.   Have you reviewed that contract?
11      A.   I believe I saw it, but it was in
12  Korean with a few words translated.
13      Q.   Did you have the contract translated?
14      A.   No.
15      Q.   Did you discuss with anybody the terms
16  and conditions of that contract?
17      A.   Only the extent of the amount of the
18  original contract, and I believe there were a couple
19  of change orders attached to it that revised the
20  amounts.
21      Q.   All right. Have you reviewed the
22  dispute of resolution provisions in that contract,
23  if any?
24      A.   As between?
25      Q.   Sejin and Poong Lim.
```

Page 10

```
 1  claims?
 2      A.  They have claims for additional man
 3  hours expended due to failure of Dick Pacific to
 4  perform their agreed-upon obligations.
 5      Q.  Well, I think you just conceded a
 6  moment ago that Sejin does not have a contract with
 7  Dick Pacific; correct?
 8      A.  That's correct.
 9      Q.  So what is the mechanism by which Sejin
10  can assert claims against Dick Pacific?
11      A.  Whatever passed-through obligations
12  Poong Lim may have against Dick Pacific.
13      Q.  And that in turn would be based on the
14  contract between Poong Lim and Sejin; correct?
15      A.  It would be based on all of the
16  understandings, contracts, and modifications to
17  those contracts between Poong Lim and Dick Pacific,
18  yes.
19      Q.  So the analysis and numbers that you
20  have prepared on behalf of Sejin, those are being
21  asserted against Poong Lim?
22      A.  My analysis of Poong Lim's performance
23  was characterized as my expectation or my review of
24  their performance and their impacts and the overruns
25  that I would expect from those impacts.  That's the
```

Page 11

```
 1  extent of it.  I haven't attempted to characterize
 2  it legally as -- or specifically as you're
 3  characterizing it.
 4      Q.  Well, as far as the analysis and
 5  opinions you've rendered on behalf of the money that
 6  is due -- you claim is due Sejin -- that would have
 7  to be asserted against Poong Lim before Poong Lim
 8  could assert that against Dick Pacific; correct?
 9      A.  Well, first of all to clarify, I don't
10  believe that I quantified an amount of money due
11  Sejin by Poong Lim or by anybody.  I prepared an
12  analysis of what I would expect as overruns caused
13  by problems not anticipated by Poong Lim, problems
14  and circumstances -- Poong Lim or Sejin -- and
15  quantified what I would expect as a number of hours
16  overrun that would be attributable to those issues.
17  I didn't quantify it in terms of dollars.
18      Q.  Well, is it your expectation that
19  should Poong Lim be successful in recovering the
20  money it seeks from Dick Pacific, that part of that
21  money would flow back to Sejin?
22      A.  That's my understanding.
23      Q.  And in order for that to occur, Sejin
24  must have some sort of a contract claim being
25  asserted against Poong Lim; correct?
```

Page 12

```
 1      A.  I would expect so, yes.
 2      Q.  Doesn't that put you in a bit of a
 3  conflict, sir, assuming that Sejin has asserted a
 4  claim against Poong Lim, which you have quantified,
 5  in the event that Poong Lim does not recover that
 6  money from Dick Pacific on behalf of Sejin?
 7      A.  That would be unfortunate.
 8      Q.  Do you believe you're in a position of
 9  conflict?
10      A.  No.
11      Q.  Do you even know if under the contract
12  between Sejin and Poong Lim, whether or not Sejin is
13  entitled to any additional compensation?
14      A.  No.  Well, let me -- again, since I
15  haven't been able to read the contract, I don't know
16  what their provisions are, and so the answer is no.
17      Q.  So you don't know what the contract
18  says.  Sejin has not prepared a claim.
19      A.  I didn't say that.  I said I have not
20  seen a claim.
21      Q.  You have not seen a claim, and you
22  don't know of the existence of any claim?
23      A.  I think you're mischaracterizing a
24  little bit what I said.  I have reviewed certain
25  claims of Sejin that were part of the Poong Lim
```

Page 13

```
 1  change order requests.  Which part of those had been
 2  prepared or submitted by Sejin to Poong Lim, I can't
 3  say as we sit here today, and I don't know if I've
 4  reviewed the entire file and to identify it, which
 5  parts of those change order requests or claims were
 6  prepared and in what form by Sejin.
 7      Q.  How much does Sejin claim it is owed by
 8  Poong Lim arising out of the Bassett project?
 9      A.  I can't answer that as we sit here.
10      Q.  Do you have any idea?
11      A.  My recollection is in the change order
12  requests they were asking for something like 9 or
13  10,000 man hours additional.
14      Q.  You reviewed that change order request?
15      A.  Yes.
16      Q.  Is that partly the basis of the
17  opinions contained in your expert report?
18      A.  Not really.
19      Q.  Is the -- is the change order request
20  that you just identified, was that filed pursuant to
21  the contract between Poong Lim and Sejin?
22      A.  That's my understanding.  But you
23  characterize a change order request.  I believe
24  there are several.
25      Q.  Right.  There's several ones.
```

Page 14

1  A. Yes.
2  Q. Do you even know if the contract
3  between Sejin and Poong Lim allows for change order
4  requests?
5  A. No.
6  Q. Do you think that's important as far as
7  being able to assert claims on behalf of Sejin
8  against Dick Pacific?
9  A. I don't know.
10 Q. You don't know if it's important or
11 not?
12 A. Not having seen the contract, I, you
13 know, whether the clauses or what clauses are in it.
14 Q. Well, if there were no provision in the
15 contract for Sejin to assert a claim against
16 Poong Lim, wouldn't it be improper for Poong Lim to
17 assert a claim against Dick Pacific on behalf of
18 Sejin?
19    MR. RUSK: Object to the extent it
20 calls for a legal conclusion.
21    THE WITNESS: I don't believe that at
22 all. I believe the absence of any language
23 regarding change order requests under a matter -- as
24 a matter of equity if you have revisions to an
25 agreement, you'd certainly have a right to pursue

Page 15

1  remedy or compensation for additional work.
2  BY MR. DAVISON:
3  Q. Is that under Korean law or American
4  law?
5  A. I believe -- again, I'm not going to
6  offer a legal conclusion, but I can't imagine any
7  law that would be -- prohibit seeking recovery from
8  impacts.
9  Q. Do you have any knowledge of Korean law
10 that would support that conclusion?
11 A. No.
12 Q. The change orders that you just
13 described that you've reviewed; correct?
14 A. Yes.
15 Q. Is that -- are those change orders the
16 basis -- the sole basis of Poong Lim's claim against
17 Dick Pacific on behalf of Sejin?
18 A. I don't know.
19 Q. Well, do you know if Poong Lim is
20 seeking to recover money from Dick Pacific/Ghemm for
21 anything other than the change orders that you
22 understand Sejin has propounded to Poong Lim?
23 A. I don't know.
24 Q. Does your analysis of Sejin's asserted
25 recovery through Poong Lim against Dick Pacific

Page 16

1  depend on anything other than the change orders that
2  have been propounded by Sejin?
3  A. My analysis is based on all of the
4  project documents that I reviewed, and I think as
5  characterizing my report an analysis, I subtract out
6  from my review and analysis those change order
7  requests.
8  Q. Well, how do you know Sejin has
9  incurred any damages out of the Bassett project if
10 Sejin has not asserted a claim against Poong Lim?
11    MR. RUSK: Objection; assumes facts not
12 in evidence.
13    THE WITNESS: I'm not sure I
14 characterized your -- I know the damages that Sejin
15 has incurred for the overruns. I did my own
16 separate analysis of what I would expect an overrun
17 to be under the circumstances.
18 BY MR. DAVISON:
19 Q. How do you know that Sejin expects to
20 be compensated for those overruns?
21 A. I asked them.
22 Q. And who did you talk to about that?
23 A. Y.S. Kim.
24 Q. And he's asked you to assert claims on
25 behalf of Sejin against Poong Lim?

Page 17

1  A. No.
2  Q. All right. How is it then that
3  Poong Lim can assert claims on behalf of Sejin if
4  Sejin has not made such a request?
5  A. I don't know that they haven't made
6  such a request.
7  Q. Have they made a request to you?
8     You just said they had not; correct?
9  A. A request for me to do what?
10 Q. Assert claims against Dick Pacific on
11 behalf of -- assert claims against Poong Lim on
12 behalf of Sejin.
13 A. My assignment was to evaluate the
14 issues, the performance and the results, separate
15 and apart from who was asserting claims against who.
16 I was asked to evaluate the detailing performance
17 and the impacts to those performance and prepare an
18 evaluation of what I would expect would have been
19 the results and which were -- that answers the
20 question.
21 Q. Would you agree with me, sir, that in
22 general, North American construction practices,
23 before a fabricator could assert a claim on behalf
24 of a detailer, the detailer must assert a claim
25 against the fabricator?

Page 18

1  A.  Generally, yes. Let me rephrase that.
2      The fabricator is responsible for the
3  detail. A good portion of the detailing is an
4  interaction between fabricator and detailer. The
5  fabricator -- the detailers are typically vendors,
6  not what I would call subcontractors. They're a
7  service provider. Whether performing under a
8  purchase order or subcontract, varies considerably.
9  In many cases they perform those functions under no
10 written agreement whatsoever.
11     But the fabricator himself has the
12 ability to analyze the total impacts to the
13 detailing process as well as the detailers do. And
14 it is not uncommon for them to do that. It's not
15 necessarily the norm.
16 Q.  Well, you're not saying that in this
17 situation that the fabricator is entitled to recover
18 damages on behalf of a subcontractor or
19 vendor/detailer that the detailer has not asserted
20 is due and owing, are you?
21 A.  No.
22 Q.  So if Sejin has not asserted a claim
23 against Poong Lim, then Poong Lim cannot assert a
24 claim against Dick Pacific on behalf of Sejin.
25     Would you agree with that?

Page 19

1  MR. RUSK: Object to the form.
2  THE WITNESS: That's a theoretical
3  question that you're asking me. And so that's the
4  question: Are you asking me a theoretical question?
5  BY MR. DAVISON:
6  Q.  I'm just asking you the question
7  however you choose --
8  A.  Based on theory, I think that's a legal
9  conclusion. It would require a legal conclusion,
10 which I probably couldn't offer. To the extent that
11 it's my understanding that Poong Lim and Sejin do
12 have open issues, I would believe that Sejin has
13 open claims against Poong Lim.
14 Q.  How do you know what to assert on
15 behalf of Sejin as far as a claim against Poong Lim?
16 A.  My analysis, it wasn't based on knowing
17 how much or how. My analysis as stated was strictly
18 an evaluation of what I would expect as a, under the
19 circumstances, a compensable overrun that would be
20 owing to Sejin by someone, based on their
21 understandings and their agreements to proceed.
22 Q.  So in your report when you have
23 analyzed the cost overruns of Sejin, your opinion is
24 is that is the amount of compensation due Sejin from
25 Poong Lim?

Page 20

1  A.  As a pass-through situation, yes.
2  Q.  What does that mean, a "pass-through
3  situation"?
4  A.  Well, the claims of Poong Lim are
5  passed through to Dick Pacific. The impacts as
6  claimed weren't due by Poong Lim. So by virtue --
7  Q.  Do you mean Sejin's?
8  A.  Sejin's claim -- Sejin had no contract
9  with Dick Pacific. So Sejin's claims would
10 technically be passed through Poong Lim to
11 Dick Pacific.
12 Q.  And would that be a function of the
13 contract between Poong Lim and Sejin, in your
14 experience?
15 A.  That would be a function of, in my
16 experience, the general relationship between a
17 vendor and subcontractor and the ultimate client or
18 the ultimate responsible party.
19 Q.  In the U.S. or in Korea?
20 A.  Everywhere. Well, I can't say with
21 Korea. In my experience in the U.S., that's
22 correct.
23 Q.  So as I understand your testimony then,
24 if -- even though if Dick Pacific had no contract
25 with Sejin, it is your belief and understanding that

Page 21

1  if Dick Pacific caused some impact to Poong Lim that
2  affected Sejin, Sejin would be entitled to assert a
3  claim through Poong Lim against Dick Pacific?
4  A.  I'm not sure I followed that. You
5  might try to state that question or read it back so
6  I can.
7  Q.  Your testimony is that you believe the
8  damages asserted on behalf of Sejin are in the form
9  of, to use your term, a pass-through claim against
10 Dick Pacific?
11 A.  You're -- I believe as I stated in my
12 report that Sejin was damaged during their
13 performance of the work on the project. And I did
14 an evaluation of what I would expect their overrun
15 to be. I don't know the total extent of the claims
16 for damages of Sejin or Poong Lim against DPG. So I
17 can't answer your question the way you're starting
18 to phrase it.
19 Q.  Well, I just want to understand, sir,
20 your opinion on this pass-through issue.
21    We've agreed that there's a -- the
22 basis of the relationship between Poong Lim and
23 Sejin is based on a contract; correct?
24 A.  No, I don't think we're agreed to that.
25 Q.  All right. Is there some other basis

Page 22

1  other than a contract that forms a relationship
2  between Poong Lim and Sejin for the Bassett project?
3      A.  My understanding on -- in -- with the
4  Korean way of doing business and contracting is a
5  lot of their understandings are unwritten and are
6  based on commitments, verbal agreements, and the
7  agreements of the parties to honor those
8  commitments.
9      Q.  You're in agreement with me that Sejin
10 does not have a contractual basis for suing
11 Dick Pacific directly?
12     A.  Not that I'm aware of.
13     Q.  So as I understand your testimony,
14 Sejin has asserted claims against Poong Lim in the
15 form of change order or other discussions; correct?
16     A.  That's my understanding.
17     Q.  And, in turn, Poong Lim has asserted
18 those claims against Dick Pacific/Ghemm; correct?
19     A.  I don't know.  I can't say to what
20 extent they have done it.  I know they have asserted
21 certain -- submitted certain change order requests
22 that involve Sejin.  But I don't know the extent
23 of -- the total extent of the claims that Poong Lim
24 has asserted against DPG that may involve Sejin.
25     Q.  So you're saying that the claims could

Page 23

1  be different than you have analyzed in your report?
2      A.  I haven't analyzed specifically the
3  claims of Poong Lim and Sejin.  I have reviewed the
4  change order requests.  But I have done an analysis
5  of what I would expect the overruns and the --
6  primarily the man hour overruns that I would
7  expected of Poong Lim and Sejin to incur based on
8  the performance -- their performance and the impacts
9  to their performance.
10     Q.  You've segregated those numbers in your
11 report; correct?
12         As we sit here today, you can tell me
13 by reviewing your report how much you believe Sejin
14 should be compensated for extra work or extra man
15 hours or impact it occurred on this project;
16 correct?
17     A.  I could say -- yes, with respect to man
18 hours.
19     Q.  And it's your opinion that somebody
20 other than Poong Lim is liable for those man hour
21 overruns?
22     A.  Yes.
23     Q.  And --
24     A.  The man hour overruns that I have
25 developed, not their total man hour overruns.

Page 24

1      Q.  Understood.
2          You haven't looked at the other change
3  orders in the context of your man hour evaluations?
4      A.  I've subtracted the other change order
5  requests from my evaluations where it was
6  appropriate to subtract them.
7      Q.  And it's your understanding -- and I
8  think you agreed with me that because Sejin has no
9  contract with Dick Pacific, that in order for Sejin
10 to recover for those extra man hours that you've
11 calculated and evaluated in your report, that claim
12 for extra man hours must first be asserted against
13 Poong Lim, and then Poong Lim can pass through that
14 claim to Dick Pacific.
15         Is that your -- is that what you've
16 said?
17     A.  I don't think I've said that at all.
18     Q.  Let me try the question this way.
19         Poong Lim subcontracted out the
20 detailing and shop drawings to Sejin; correct?
21     A.  They have an agreement to prepare shop
22 drawings -- or agreement for preparation of shop
23 drawings.  Whether you'd characterize it as a
24 subcontract or a purchase order, I'm not sure what
25 the document said it was.

Page 25

1      Q.  Poong Lim and Sejin are two different
2  entities, are they not?
3      A.  Yes.
4      Q.  The same -- comparable to the industry
5  in the U.S. where one business perhaps is a
6  fabrication business and when they're performing
7  fabrication work, they might subcontract out or send
8  a purchase order or enter into some agreement with
9  another business or company that provides shop
10 drawings?
11     A.  Yes, sir.  I'm not in disagreement with
12 the order of things that you're talking about, but
13 it's the term "subcontract" that I've having
14 difficulty with.
15     Q.  All right.  Let me just use the term
16 "contract" then.
17     A.  As long as that word is encompassing --
18 is a generality that encompassed agreements, oral
19 agreements, purchase orders, whatever, you can say
20 that.  The word agreement would probably be better.
21 But you can use whatever you like as long as we
22 understand that it's --
23     Q.  All right.  Now, do you agree with me
24 that in order for Sejin to be compensated for what
25 it feels were extra hours incurred outside or in

Page 26

1  addition to what the agreement or contract between
2  Sejin and Poong Lim acquired, that the claim for
3  extra hours must be asserted against Poong Lim as
4  opposed to Dick Pacific?
5       MR. RUSK: Object to the extent it
6  calls for a legal conclusion.
7       THE WITNESS: I think that's kind of a,
8  either a complex or a compound question. I'm trying
9  to think of the answer. But the first part of it, I
10 would have to answer I don't know what the
11 understanding is between Poong Lim and Sejin as far
12 as what Poong Lim might do to compensate Sejin for
13 their additional hour overruns, irrespective of a
14 claim or collection against Dick Pacific. So I
15 can't speak to that.
16 BY MR. DAVISON:
17      Q.  You used the term earlier,
18 "pass-through."
19      A.  Yes.
20      Q.  All right. Does that mean that
21 whatever claims Sejin has against Poong Lim, that
22 Poong Lim is passing through those claims to
23 Dick Pacific?
24      A.  As I understand with respect to the
25 change order request, Poong Lim is, in fact, passing

Page 27

1  through certain claims of Sejin to Dick Pacific.
2       Q.  Now, what about the analysis you did of
3  extra hours that Sejin allegedly incurred in this
4  project, are those extra hours not also a
5  pass-through claim through Poong Lim to
6  Dick Pacific?
7       A.  I don't know what has been done with
8  the extra hours or the hours per my evaluation,
9  whether they've been claimed against Poong Lim or
10 claimed against Dick Pacific or anyone.
11      Q.  Well, I mean, the extra hours that
12 Poong Lim incurred -- excuse me -- that Sejin
13 incurred, you have said in your report are the
14 responsibility of Dick Pacific/Ghemm to pay for;
15 correct?
16      A.  I've asserted in my report that those
17 additional hours are the responsibility of the
18 actions or inactions of Dick Pacific. I don't know
19 whether they've been submitted as a claim against
20 Dick Pacific or not.
21      Q.  Would you consider a lawsuit to be a
22 claim?
23      A.  Certainly. But I don't know what -- I
24 don't believe I've ever read the complaint itself to
25 even know what Dick Pacific -- or what Poong Lim has

Page 28

1  asserted in its totality against Dick Pacific.
2       Q.  Let me just see if we can summarize it.
3       If Poong Lim is entitled to additional
4  compensation for its contract, whether it's through
5  change order or claims for extra hours of the nature
6  you've described in your report, don't we have to
7  characterize those claims as pass-through claims in
8  order for Poong Lim to be able to assert those
9  against Dick Pacific?
10      MR. RUSK: Object to the extent it
11 calls for a legal conclusion.
12      THE WITNESS: I don't have a good
13 answer for that because I don't know -- if we're
14 talking theoretically, I don't know what the end
15 result was of those numbers of man hour overruns
16 that I came up with, whether they're even being
17 submitted as a claim against Dick Pacific or not.
18 BY MR. DAVISON:
19      Q.  If they were, would they be submitted
20 in the context of a pass-through claim?
21      A.  From Sejin?
22      Q.  Yes.
23      A.  I suppose so.
24      Q.  And the reason that you would
25 characterize those as pass-through claims is because

Page 29

1  it's your belief that Dick Pacific caused Sejin to
2  incur those extra hours?
3       A.  Yes.
4       Q.  Now, would you agree with me that if it
5  was the Corps of Engineers that caused Dick Pacific
6  to cause Poong Lim to cause Sejin to incur the extra
7  hours, that Dick Pacific could assert a pass-through
8  claim against the Corps?
9       MR. RUSK: Object to the extent it
10 calls for a legal conclusion.
11      THE WITNESS: Potentially, but I don't
12 know where -- you know, it depends on what the
13 contract said and what the matter of law is as far
14 as who would be responsible. If the Corps was ruled
15 to be responsible for those claims and they paid
16 them, yes, I guess Dick Pacific wouldn't have to.
17 BY MR. DAVISON:
18      Q.  What, sir, was your scope of work for
19 the expert services that you are providing in this
20 case?
21      A.  Well, it was several-fold, but
22 ultimately it was to prepare a report analyzing the
23 required work under the agreement between Poong Lim
24 and DPG, evaluate impacts to that performance, and
25 to evaluate the results or the damages that I would

Page 225

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA for the use
of POONG LIM/PERT JOINT VENTURE,

     Plaintiff,

vs.

DICK PACIFIC/GHEMM JOINT VENTURE,
CONTINTENTAL CASUALTY COMPANY,
NATIONAL FIRE INSURANCE CO. OF
HARTFORD, SEABOARD SURETY CO.,
and ST. PAUL FIRE AND MARINE
INSURANCE COMPANY,

     Defendants.
_____/
Case No. A03-0290 Civil


DEPOSITION OF STEPHEN C. SCHWARTZ

VOLUME II

Pages 225 - 348, inclusive

Thursday, May 26, 2005, 1:30 P.M.


Taken by Counsel for Defendants

at

Law Offices of Oles, Morrison, Rinker & Baker, LLP

745 W. Fourth Avenue, Suite 502

Anchorage, Alaska

STEPHEN C. SCHWARTZ, VOL. II

Page 226

1  A-P-P-E-A-R-A-N-C-E-S
2  For Plaintiff:
3  LAW OFFICES OF OLES, MORRISON, RINKER & BAKER, LLP
4  By: J. Craig Rusk, Esq.
5  701 Pike Street, Suite 1700
6  Seattle, WA 98101
7  206/623-3427
8
9  For Defendants:
10 LAW OFFICES OF DAVISON & DAVISON
11 By: Bruce E. Davison, Esq.
12 3351 Arctic Boulevard
13 Anchorage, AK 99503
14 907/563-6555
15
16 Reported by:
17 Angela Peronto, CSR, RMR
18 Summit Court Reporting, LLC

Page 227

1           I-N-D-E-X
2  EXAMINATION BY:              PAGE
3  Mr. Davison                  228
4
...
11          E-X-H-I-B-I-T-S
12 NUMBER                        PAGE
13 536   Bassett Hospital "ABC" Contract   286
       Cost List

EXHIBIT  4
Page  9  of  11  Pages

Page 228

1  Anchorage, Alaska, Thursday, 5/26/05, 1:30 P.M.
2         STEPHEN C. SCHWARTZ,
3  deponent herein, being previously sworn on oath by
4  Angela Peronto, was examined and testified as
5         follows:
6         EXAMINATION
7  BY MR. DAVISON:
8     Q.  The witness is still under oath;
9  correct?
10        Will the witness acknowledge --
11    A.  Yes.
12    Q.  -- you understand you're still under
13 oath?
14    A.  Yes, sir.
15    Q.  Would you get your report, please,
16 Exhibit 527.  Turn, if you would, to Exhibit 24 of
17 your report.
18        Do you recall Exhibit 24 from
19 yesterday?
20    A.  Yes, sir.
21    Q.  If you would, sir, would you -- now,
22 this email is from Larry Johnson to Rick Jensen;
23 correct?
24    A.  I assume so.
25    Q.  And I believe you testified yesterday

Page 229

1  that you relied upon this email to support
2  Poong Lim's contention that there was a two-week
3  turnaround on shop drawings.
4         Do you recall that testimony?
5     A.  I recall my testimony regarding that
6  there was other documents in this -- and this is a
7  document in this report that confirmed the
8  understanding of the two-week turnaround, yes.
9     Q.  Look in the very first line after the
10 salutation there, "Rick," where it says, "Please
11 consider our statement in Korea that we -- I'm
12 emphasizing we -- would require two weeks to return
13 posted shop drawings basically as an overly
14 optimistic commitment."
15        In your opinion, Mr. Schwartz, who does
16 the "we" refer to?
17    A.  I would only be speculating, but I
18 would suspect that Larry Johnson was referring to
19 HKS.
20    Q.  Thank you.
21        Now go to the next paragraph, paragraph
22 1, where Mr. Johnson offers an explanation of
23 why HKS was overly optimistic.
24        Do you see that paragraph 1?
25        Would you please read it to yourself.

2 (Pages 226 to 229)

Page 242

1  But that submittal was submitted by
2  hand to HKS in Korea is my understanding or to DPG
3  in Korea, that initial submittal that you looked at.
4      Q.  But do you know the first date that
5  submittals were made by Poong Lim to the Project
6  Point web site?
7      A.  No. I would only be speculating. On
8  the submittals, what I call -- the numbering on the
9  left-hand column, just for anyone's information, I
10 created so I could sort these.
11     Q.  Under submittal number?
12     A.  Under submittal number, those are my
13 numbers.
14         And as I recall, the next submittal,
15 whether it would be named as 2.1, the 5202 submittal
16 was the first one sent to Dallas -- or sent to the
17 web site.
18     Q.  Now, what's the significance of the
19 date under the Date Approved column?
20     A.  That's the date in Poong Lim's record
21 that they received the drawing or they recognized it
22 as being received. They either found it on the web
23 site or whatever.
24     Q.  Received and approved by the engineer
25 of record?

Page 243

1      A.  The return date.
2      Q.  Now, if there were -- if there was more
3  than one submittal, there would be more than one
4  return date; correct?
5          Let me strike that. That was a poorly
6  worded question.
7          For a given shop drawing, there might
8  be more than one submittal before it's approved by
9  the engineer of record; correct?
10     A.  That's correct.
11         In answer to your question, that column
12 should be headed Date of Return.
13     Q.  Of which shop drawing, if there were
14 multiple submittals of a shop drawing?
15     A.  This is a summary of the original shop
16 drawing structural submittals.
17     Q.  Well, I still don't understand what the
18 date of return means.
19         Is that the final approval by the
20 engineer of record so that the shop drawing can be
21 released for fabrication?
22     A.  That's the date that that original
23 submittal, the drawings in that submittal, were
24 returned to Poong Lim.
25         Whether it was approved -- I don't

Page 244

1  think they were -- or approved with corrections
2  noted or sent "revise and resubmit," that's the date
3  they were returned to Poong Lim.
4          I have not gone into an analysis of
5  when final drawings were ultimately approved by or
6  accepted as approved by anybody.
7      Q.  Take a look at what you've labeled
8  Submittal No. 7.1, 7.2, 7.3, and 7.4.
9      A.  Yes.
10     Q.  Now, under 7.1, you've listed 85
11 sheets?
12     A.  Yes.
13     Q.  And you've got the date of submittal is
14 05/25/02?
15     A.  Yes.
16     Q.  And you've got the date of return,
17 which is the corrected heading for that column, as
18 06/28/02?
19     A.  Yes.
20     Q.  What was the state of the drawings that
21 were returned on 06/28/02?
22     A.  Without looking at each individual
23 drawing, I don't know.
24     Q.  Could some of the drawings have
25 required resubmittal by Poong Lim to the engineer of

Page 245

1  record?
2      A.  Possibly.
3      Q.  So this date under date of return, as I
4  understand your testimony, is the date of the first
5  return by the engineer of record and does not
6  account for whether the drawing has to be
7  resubmitted to the engineer of record; is that
8  correct?
9      A.  That's correct.
10     Q.  And then the second document in this
11 exhibit, what information does that intend to
12 convey?
13     A.  It's simply a graphical representation
14 of the data on the spreadsheet.
15     Q.  Turn, if you would, sir, to Exhibit 20
16 of your expert report. That's a one-page
17 spreadsheet titled, Bassett Hospital replacement
18 detailing manhour summary, dash, estimate and
19 actual; is that correct?
20     A.  Yes.
21     Q.  What's the purpose of this exhibit?
22     A.  I asked Y.S. Kim of Sejin detailing to
23 provide me the best information that he had
24 available in different categories of activity of
25 what his estimated hours were and if he knew what

STEPHEN C. SCHWARTZ, VOL. II

Page 246

1 his actual hours were expended for those tasks.
2      I created the blank sheet, and under
3 "Comments," Sejin detailing provided the comments
4 and all the numbers.
5   Q.  So none of this data is your original
6 data?
7   A.  The numbers are not my numbers.  They
8 were entered into the sheet by, I presume, Y.S. Kim
9 at Sejin.
10  Q.  And the comments, who prepared the
11 comments?
12  A.  Sejin or Poong Lim.  I believe it was
13 Sejin detailing.
14  Q.  And where are the documents that you
15 relied upon to prepare Exhibit 20?
16  A.  I didn't prepare Exhibit 20.  I
17 prepared the blank sheet and emailed it to Sejin,
18 and Sejin emailed it back to me -- or Poong Lim
19 emailed it back to me with that information filled
20 in.
21      Actually, I take that back.  I handed
22 it to them in November in Seattle, this blank sheet,
23 on a flash drive.  He put it on his computer, and it
24 was returned to me in this form completed.
25  Q.  So this Exhibit 20 was not prepared by

Page 247

1 you.  It was prepared by Sejin?
2   A.  The data in the exhibit was prepared by
3 Sejin.  It was provided by Sejin in a form, and a
4 blank form filled out or prepared by me.
5   Q.  Well, let's look at the first line item
6 there, building sequence No. 1 to No. 4, structural
7 steel.
8       There's the No. 7,000?
9   A.  Yes.
10  Q.  What does that number mean?
11  A.  If Sejin correctly interpreted my
12 request to have for building sequence 1 to 4
13 structural steel, the estimated detailing hours he
14 wrote in there, 7,000, was his estimated detailing
15 hours for structural steel building sequence 1 to 4.
16  Q.  Let me just be clear.
17      This information came from Mr. Kim at
18 Sejin?
19  A.  I believe so, yes.
20  Q.  Not from Poong Lim?
21  A.  That's my recollection.
22  Q.  Now, what information did you look at
23 to verify the accuracy of the 7,000 estimated
24 detailing labor hours under entry No. 1 there?
25  A.  Nothing.

Page 248

1   Q.  Is that true of the remainder of the
2 numbers in the column, estimated detailing labor
3 hours?
4   A.  Yes, sir.
5   Q.  Now, the next column, actual detailing
6 labor hours.
7       Are you relying completely and totally
8 upon the numbers furnished by Mr. Kim at Sejin?
9   A.  For the individual elements of the
10 work, yes, although the manhour expenditures by
11 Sejin totaled approximately this 52,974 hours, if I
12 recall.
13      So there's another document that
14 matches that number.  Approximately.
15  Q.  Is that document contained in your
16 report?
17  A.  As I recall, it is.
18  Q.  What exhibit would that be?
19  A.  42, maybe.
20  Q.  So do I understand your testimony to be
21 that Exhibit 20 was prepared independently of
22 Exhibit 42?
23  A.  Exhibit 20 was filled in, the numbers
24 were filled in by Sejin detailing.  I don't know
25 whether it was prepared independently of that sheet.

Page 249

1   Q.  Where did you get Exhibit 42?
2   A.  From the documents in the Oles Morrison
3 document room.
4   Q.  And what -- why is Exhibit 42 important
5 to your report?
6   A.  It provides the only basis that I have
7 for the total manhours expended for detailing and
8 when it was expended.
9   Q.  Have you looked at any data that would
10 support or verify or substantiate the information
11 shown in Exhibit 42?
12  A.  No specific data, no.
13  Q.  Are you, sir, as we sit here today as
14 you're testifying under oath, are you testifying to
15 the accuracy of any of the numbers in Exhibit 42?
16  A.  No, only to the extent that both
17 Y.S. Kim and one of his lead guys that helped put
18 this together said it was accurate to the best of
19 their knowledge.
20  Q.  Now, did you review any other
21 accounting data from Sejin -- I'm going back to
22 Exhibit No. 20 -- to verify that, in fact, Sejin
23 kept track of hours according to the different areas
24 listed under the item count?
25  A.  No, I haven't seen any written data.